Hall-Moody Institute *v.* Copass.

HALL-MOODY INSTITUTE *v.* COPASS.

(*Jackson.* May 10, 1902.)

1. CORPORATION. *Eleemosynary subject to action for breach of contract.*

An eleemosynary corporation, managed by trustees, which is devoted to education of boys and girls and supported by tuition fees and voluntary contributions, is liable to action, by a teacher employed by its trustees, for breach of the contract of employment by an unwarranted dismissal of the teacher before the expiration of the term of employment. (*Post, pp. 584, 585.*)

2. SCHOOLS. *Regulation of conduct of teachers.*

Rules prescribed by the trustees of an educational institution for the regulation of the conduct of its teachers in social matters, if not made part of the contract of employment, in order to render their violation a lawful and valid excuse for dismissal of the teacher before the expiration of his term of employment, must not be arbitrary, but reasonable, and such as are essential to preserve the efficiency, usefulness, and influence of the teacher, and to protect the character, discipline, and success of the institution. And rules forbidding teachers to receive callers or have company on school days, from Monday to Friday afternoon, or to have company in the parlor later than 10:30 or 11 o'clock P.M., are, in their application to a young lady teacher, *prima facie* unreasonable and oppressive. (*Post, pp. 585-588.*)

3. CHARGE OF COURT. *Justified by the facts.*

In an action by a lady school teacher for salary, to which the defense of dismissal for violation of rules regulating her social conduct is interposed, although she is not charged with immoral and unchaste conduct, but only with certain irregularities in her social intercourse, there is no error of which the defendants can complain for the Court to charge, upon evidence to which it was applicable, that "if she was guilty of going into society

or of keeping late hours in company of young men, or going with them to such questionable places as was likely to cause her reputation as a lady to be called into question, or as would impair her ability and efficiency as a teacher, or disqualify her to perform her duties as well as she might otherwise have done her duties as a teacher, then the Board of Trustees would have the right to dismiss her and terminate its contract with her for these reasons." (*Post, pp. 588–590.*)

4. SAME. *Not erroneous in absence of request for further instructions.*

And, in such case, it is not error of which defendant can complain, in the absence of a request for further or more specific instructions, for the Court to charge that plaintiff must have "habitually" counseled and encouraged the pupils of the school in the violation of the rules regulating their social intercourse, to have justified her dismissal, where the proof showed her only dereliction in this particular, if any, was a failure to reprimand certain irregularities of conduct that came under her observation. (*Post, pp. 590, 591.*)

5. SAME. *Not erroneous as to teacher's duty in keeping order.*

And, in such case, it is not error for the Court to charge, in effect, that a school teacher is not an insurer of good order in the school-room, but that she shall be held to the exercise of such care, diligence, and efforts to preserve order as, under the circumstances of the particular case, are reasonably within her power. (*Post, pp. 591–593.*)

6. SAME. *Refusal of special requests not erroneous, when.*

Refusal of the Court to give special requests that are fully covered by the principal charge is not erroneous. (*Post, pp. 593, 594.*)

7. VERDICT. *Sustained by the facts.*

This Court finds no sufficient reason for setting aside the verdict of the jury in favor of the plaintiff upon the facts which are fully set out in the opinion. (*Post, pp. 594–606.*)

8. SAME. *Not set aside for undue influence over jury.*

This Court refuses to reverse the action of the Circuit Judge, refusing to set aside the jury's verdict upon the conflicting evidence set out in the opinion, by which it is sought to prove on the one hand and disprove on the other undue pressure and

Hall-Moody Institute *v.* Copass.

influence brought to bear upon the jury by public demonstrations during the trial. (*Post, pp. 606–609.*)

FROM   WEAKLEY.

Appeal in error from the Circuit Court of Weakley County. W. H. SWIGGART, J.

R. E. MAIDEN and F. P. HALL for Institute.

JONES, HORNSBY & HANNINGS for Copass.

WILKES, J. This is an action for damages arising out of the discharge of the plaintiff, Frances Copass, as a teacher in the Hall-Moody Institute, of Martin, Tennessee. It was commenced before a Justice of the Peace of Weakley County. On appeal to the Circuit Court, there was a verdict and judgment for $275 in favor of the plaintiff, and the Institute has appealed to this Court and assigned errors.

It is said that it was error in the Court below to instruct the jury that the Institute could be held liable by judgment for the discharge of the plaintiff by the trustees of the school. The argument is that the Institute is an eleemosynary institution, and hence not liable to judgment. The

Hall-Moody Institute *v.* Copass.

contention might and probably would be correct if this were a suit for a tort committed by the trustees, but the action is not one of tort, but for a breach of contract, whereby the trustees agreed upon the part of the Institute to pay the plaintiff a stipulated salary for her personal services as teacher. It appears that the Institute is chartered under the laws of the State as an educational corporation, with power to sue and be sued, and is operated in the interest of the education of boys and girls, and not for the purpose of making money. The trustees make contracts with principals and teachers, and the latter are to be paid out of the tuition fees received from the pupils, and any deficit there may be is made up out of their own pockets. Under this statement of facts, the trial Court was correct in charging that the corporation would be liable for the contracts made by its trustees, and such contracts would be enforced in the same manner and to the same extent as if made by individuals.

It is said the trial Judge erred in charging as follows: "Unless the contract so provided, the Board of Trustees would not have the right and power to adopt a rule or by-law prescribing that the plaintiff, as one of the teachers, should not receive callers or have company during the school days, say from Monday morning to Friday afternoon, nor to adopt a rule prescribing that she

Hall-Moody Institute *v.* Copass.

should not have company in the parlor of evenings later than 10:30 or 11 o'clock. Such a rule, or regulation, or by-law, as either of these would be regarded in law as arbitrary, unreasonable, and oppressive, and could not be upheld or enforced, and the plaintiff would have the legal right to ignore them or refuse compliance with them. The Board of Trustees would not have the right to discharge the plaintiff for her refusal to obey or comply with such rules as these, and if they did so discharge her for this reason alone, the defendant would be guilty of a breach of its contract, and would be liable to the plaintiff therefor." This is an excerpt from the trial Judge's charge, and, taken separately and alone, does not do justice to his instructions. Following the language complained of, and as a part of the same instructions, the Court said: "While this is true, yet the plaintiff, under her contract, owed to the defendant as a teacher her loyal support, her faithful service, her most efficient work, and she could not lawfully and rightfully engage in such social functions or devote so much of her time and attention to social pleasures, or engage in such other work, conduct, or practices, as would impair her usefulness and efficiency as a teacher, or, as when properly understood and interpreted, would injure the school or interfere with the discipline of its

Hall-Moody Institute *v.* Copass.

pupils, or tend to damage its reputation and character as an institution of learning."

Immediately preceding the part of the charge complained of, the trial Judge said: "The defendant would have the right, under the law, to discharge the plaintiff and terminate her connection with said school for any reasonable cause, but not arbitrarily and without a good cause. It had the right to discharge her for incompetency as a teacher, if the fact existed, or for her insubordination or refusal to carry out or comply with or conform to any reasonable by-laws or regulations made and adopted by the Board of Trustees, or by the President of the faculty under and by the direction of said Board, or it would have the right to dismiss her from the school and terminate her connection therewith for immorality, immodest, or unladylike conduct and behavior, or for any improper, immodest, and unbecoming conduct such as would be likely to be hurtful or injurious to the reputation or standing of the school, or to impede and prevent or interfere with the proper progress of its pupils or their proper discipline and training. But under these principles the Board of Trustees would not have the right to interfere with her social relations or her right to receive and entertain her friends, or with the time at which she should dismiss them of evenings, so long as her actions

and conduct in these particulars were usual, chaste, proper, ladylike, and becoming a lady in her position in life, and not hurtful nor injurious to the school, nor incompatible with her duties as a teacher in said school under the contract." Then followed the portion of the charge complained of.

We think this a very clear, correct, and lucid statement of the relations of the teacher to the school, and a fair and a full exposition of the duties that may be demanded of the teacher by the Trustees in the absence of any special contract prescribing otherwise. It is insisted by the Institute that it was a rule of the school that teachers, as well as pupils, should not attend social functions or go into society while connected with the school, but this, we think, is not sustained by the record, but the most that can be said is, that it was the policy of the school that there should be no excesses in this direction, but that both teachers and pupils should be circumspect in their relations to society and not allow their social pleasures and indulgences to interfere with their work. The question of what is excessive will be treated under another assignment, that there is no evidence to support the verdict.

It is next said the Court erred in saying: "If she was guilty of going into society or of keeping late hours in company of young men, or going with them to such questionable places

as was likely to cause her reputation as a lady to be called into question, or as would impair her ability and efficiency as a teacher, or disqualify her to perform her duties as well as she might otherwise have done her duties as a teacher, then the Board of Trustees would have the right to dismiss her and terminate its contract with her for these reasons." It is said that this portion of the charge is incorrect in that it misled the jury into supposing that she was charged with conduct unbecoming a lady, and was guilty of immoral or unchaste conduct, when no such charge was intended, nor was such a question involved in the case, but the only question was whether she neglected her duties and was inefficient in their discharge, and whether she indulged in social functions to such an extent as to impair her influence and efficiency as a teacher.

We are of the opinion the range of examination of witnesses in this case justified and called for the charge given. While no immoral or unchaste conduct was charged or testified to, there was evidence intended to show that she was indiscreet in visiting a minstrel show; in going to the railroad station at an early hour of the morning to see a lady friend off on the train, and returning alone to her boarding-house; in going to a cafe and partaking of refreshments, and of receiving the attention of young men at a late hour in the evening, and of other impro-

prieties of like character. It was eminently proper that the issue of her innocence and discretion under these facts and insinuations should be submitted to a jury, since they must detract from her high standing as a lady and impair her influence and usefulness.

It is said the Court committed affirmative error in charging the jury as follows:

"Again, if she was guilty of habitually counseling or encouraging the pupils of said school, or any of them, to disobey and violate the proper and reasonable regulations and rules of the school, which had been adopted by the Board of Trustees, or by the President of said school, under the authority of said board, such as a rule forbidding and prohibiting the boys and girls to visit each other without permission, then, under these circumstances, the Board would have the right to dismiss her from the school and terminate her connection with it." The criticism of this part of the charge is the use of the word "habitual," and the insistence is that the dereliction of duty need not have been habitual in order to justify the discharge. There is nothing in this charge that is error of which the defendant can complain. If it is desired to lay down the rule as contended, that an occasional encouragement would justify a discharge, the defendant should have asked for such charge. The worst that can be said upon this feature of the

Hall-Moody Institute *v.* Copass.

case is, that upon some occasions she might have reprimanded the pupils when she did not. It appears that one of her pupils, Mr. Hoyt White, a young man of some 20 years of age, called on her in a social way on two occasions; she did not inquire of him whether he had permission to do so from the principal, but simply presumed that he had. Mr. White testified on the trial that he did not have such permission, and the gravamen of her offense in this regard consisted in not inquiring whether he had a "permit," or in not sending him home. He also testified that on one occasion, while walking with the complainant, she leaned familiarly on his arm, and at the same time said to some pupils whom they met, to "hurry up" if they desired to catch up with certain young ladies. It was in view of this circumstance, also, that the Court gave the charge he did as to improper conduct, inasmuch as the plaintiff flatly contradicted Mr. White in his statement of her conduct on that occasion.

It is said the Court committed affirmative error in charging the jury as follows: "If you find that when the original contract was made, there was no express stipulation that she was to keep the study hall, but that she was afterward assigned to the position and work, and that the disorder and confusion, if any there were, in the study hall, was not due to her neglect or inattention to her duties, but that it was due to

Hall-Moody Institute *v.* Copass.

the fact that she was a lady, and a young lady, and that many of the pupils were young men or large boys, and that they were unruly and could not be restrained by plaintiff as a young lady without fault on her part, then under these circumstances she would not be liable for such disorder."

We think there was no error in this charge. The plaintiff was put in charge of the study hall, in which there were some 65 pupils of both sexes, many of them young men and young ladies of her own age. She was required to hear eight classes a day in this hall, and each consumed forty-five minutes. In addition, she was required to tap the bell for the different hours and classes. She could not be held as an insurer of good order under such circumstances. As tersely stated by herself, "she could not see behind herself;" while she was engaged in hearing a class recite, and in demonstrating on the blackboard, the unruly boys would take advantage of her occupation and do things which would create disturbance in the room. It would be beyond the reach of human possibilities to expect a young lady to preserve entire good order in such an assemblage of young people full of life and fun, and often wanton mischief. Even in this Court, composed of mature, not to say old men, devoted to the enforcement of law and order, with a

Hall-Moody Institute *v.* Copass.

Chief Justice ever on the alert, and a Marshal ready and watchful to check any disorder, and with very rare occasion for any fun and pleasantry; occasionally a slight ripple of disturbance will arise, and that, notwithstanding the Court is armed with a process of contempt to preserve and enforce order. We are judicially informed that some disorder occasionally occurs in the trial Courts, notwithstanding the efforts of the trial Judge and Sheriff. It is requiring too much to hold the plaintiff as an insurer against any and all disturbances in a school-room. The trial Judge properly charged that she would be responsible for inattention and neglect only, and could not be held to keep order at all hazards. This would be requiring more diligence and a higher degree of control than is required of common carriers in the shipment of mules and other live stock, where the carrier is excused from such injury as results from the native unruly disposition of the stock, and we cannot require of this young lady, in the management of boys and girls congregated in a school-room, a higher degree of control than is applied to shippers of live stock crowded into cars and subjected to many inconveniences.

It is complained that the Court refused to give in charge two special requests, saying as a reason why he did not, that the subject-matter was em-

braced in the body of the charge. In this we think he was correct, and the matters of special request was embraced in the general charge.

It is next said there is no evidence to support the verdict. This assignment raises two questions of primary importance. One, whether the plaintiff properly discharged her duties as hall or chapel teacher, and the other whether she indulged excessively and to the detriment of the school in social recreation or dissipations. Upon these questions quite a large volume of proof is taken, and all of the minute details of the school and the social life of the plaintiff are laid bare.

The testimony bearing upon her derelictions of duty in the school-room and her demeanor and conduct in society is given almost altogether by the trustees of the institution and their families. The school was a new one, founded but a short time previously, and it was during its first term that this controversy arose. The Board was a new one and the teacher was new. There can be no doubt from this record that the Trustees were devoted to what they thought were the best interests of the school, and they were extremely solicitous as to the conduct and demeanor of its teachers. Their zeal and devotion and attention to the school and its interests cannot be too highly commended. It was a denominational school under the care and dominion of the Missionary Baptist Church. The plaintiff, as well as the

other teacher and principal, belonged to this denomination, and so did the Trustees. They were selected from the business men of Martin, some of them being merchants, some bankers, some grocers, and others engaged in other occupations, and among them the minister of the Baptist Church. That they were sincerely and devotedly interested in the welfare of the school cannot for a moment be doubted; if they made any mistake in the management it arose not from a want of zeal, but from a want of experience and knowledge of the requirements of the situation.

The plaintiff was a young lady of excellent education, having received the degree of M.A. and B.A. from the Southwestern Baptist University of Jackson, Tennessee, an institution of high standing and repute. She had previously spent three years in Clinton College, Kentucky. She was strongly recommended by the Presidents of these institutions, and no imputation is made against her educational and scholastic attainments. She had just reached her majority and was for the first time engaged in teaching. The record shows she was a young lady, handsome in appearance, attractive in bearing, gifted in conversation, and of a cheerful and social disposition. The Trustees were of the opinion that she was too much devoted to society and had too much company for the best interests of the school. She says that, being a new girl in Martin, she had tem-

porarily attracted attention, which she expected would soon cease, as is usual in such cases. As before stated, the record does not bear out the contention that she had agreed not to receive company, but the fact, as established by record, is that it was the policy of the management that there should be no excessive indulgence in social pleasures. She, as well as the other teachers, demurred to being bound by any rigid rule upon this subject, and insisted they be left a rule unto themselves, with the assurance that their efficiency and influence should not be impaired thereby. One teacher, it is true, thought a more rigid rule should be adopted, basing her view upon what she knew of the surroundings in the city of Martin, but she was in a hopeless minority, and the rule of individual discretion prevailed, with a caution from the principal to be very discreet.

The Court at the very threshold is confronted by the most difficult and delicate question that has ever been presented for its consideration; that is, what is excessive indulgence in social functions and recreations? The Court has no judicial knowledge whatever on the subject, and but little experience and observation. The evidence in this case is very conflicting. The Trustees, with their wives and children, have ranged themselves on one side, while the plaintiff and her friends have lined up on the other. The Court is not disposed to lay down any rigid rule. What would

be excess in a lady of retiring domestic habits and views might not be in the case of one of a lively, social disposition, coupled with a handsome appearance and attractive manner. Perhaps no two could be measured by the same standard. It appears that the plaintiff was to some extent supplied with a boarding house by the Trustees, generally in their own homes, and while there she was under their watchful care, so much so that the number of her visitors and the dates of their visits were impressed on the memories of the Trustees, or else jotted down in memoranda, so that we are furnished with the names and number of visitors plaintiff had, the dates of their calls, and the hours they kept. In fact, we have before us almost a diary of plaintiff's life as a teacher, even to the minutest details. The Trustees' statements, as witnesses, are to the effect that they watched over her not only as a teacher in the interest of the school, but as fathers in her own interest, and we have no doubt of the truth of their statements. While they talked among themselves as to her demeanor and indulged in some criticisms, they do not appear at first to have talked to her. After a time, however, the Board took action, and appointed a committee to wait on her and remonstrate with her, and notify her that unless she changed her conduct they would be compelled to discharge her, as her mode of living was detrimental to her efficiency and

influence. This committee consisted of the pastor and another trustee, and they agreed to call on her and talk it over. They planned their mode of operation before coming into her presence. The minister was to open the interview. He proceeded to talk to her, and she defended her action in a forcible manner—that is, "she talked back," as ladies are some times prone to do. The other committeeman says that after the minister had spent some sixty minutes or more in an earnest appeal, he saw that he was about exhausted, and thereupon intervened himself and continued the lecture. He says he told her that the minister had reasoned with her to no avail, and that he would talk plain, and stated his ultimatum that she must quit having company from Monday morning till Friday night, but that from Friday night until Sunday night, if she wanted company, to go ahead, it was all right; but she must not sit up after 10:30, as that was the retiring hour at her boarding-house. The witness adds that after laying down this ultimatum, and giving this explanation, he and his brother committeemen sat there for quite awhile and "looked at each other." He says that the Board had directed them to say to her that she would be discharged if she did not comply with their commands, but the plaintiff very cordially and politely thanked them and agreed to comply with their **demands,** and talked so pleasantly and said she

was a "new girl in the town," and had a young lady visitor, and that the matter would be all right, and they were thoroughly beguiled by her manners and ways. This was on the 10th of December. On the Saturday following, Barlow's Minstrels struck the town, and the plaintiff, having received a free ticket and an invitation from a gentleman to attend, went to this committeeman and asked if she could attend, and if there was any impropriety in her going. He told her she could go and there was no impropriety; that if ever there was a good minstrel show, Barlow's was, and that if he was well enough he would go himself and take his wife. He cautioned her again not to have any company during the week, and she assured him she hadn't seen a man since the former interview.

On Sunday evening, after this minstrel show on Saturday, this committeeman called on plaintiff at her boarding-house and talked to her about keeping better order in the chapel, a matter which, for want of time, physical capacity, or some other cause, had been neglected at the first interview. He said he left thinking he had the plaintiff "going his way," and was pleased with the interview, and so reported to the President. But she failed to lecture the pupils on Monday morning, as she promised, and he learned she had company on Sunday night until about 12 o'clock. He thereupon reported to the Board that she had

talked so nicely and fairly to the committee that
they had failed to notify her, as the Board
directed, that she should be discharged if she
failed to comply with the demands. Thereupon
the same committee was appointed to visit her
again and give her the ultimatum of the Board
as to her discharge. He says they followed up
the same plan of attack as on the first occa-
sion; that the minister talked first, until he .ex-
hausted himself, and he then took it up and
told her in plain terms what the Board de-
manded. She states that she protested .that she
had done nothing wrong, and again thanked the
committee, and they retired. This Trustee, who
had been so active, was then attacked with la
grippe, and went to bed. However, he had con-
ferences with the Board, and they decided it
would be useless to temporize further. He also
saw plaintiff, who insisted that she had done
nothing wrong, and, as a result of the interview
with her, he expressed regret that she had not
been discharged two months earlier, as her con-
duct was injuring the school, and said that in
New York, Louisville, or Nashville, the "Four
Hundred" could do such things, but in Weakley
County it wouldn't work. Soon after this plain-
tiff was summoned before the Board of Trustees,
and was informed they desired her resignation,
because she had failed to comply with their de-
mands. She asked for an explanation, and was

told that the Board had taken action and asked her to resign; if not, she would be dismissed. She asked for time to think, when the reply was: "We will not discuss the matter. We have acted; it is settled, and you must resign or be dismissed." She asked for specifications as to wherein she had failed, but was given the same answer, that it was settled and she had her choice to resign or be dismissed. One after another advised her to resign, the Principal saying: "Knowing the brethren, Miss Copass, I believe it best for you to resign." She replied she had no grounds to base her resignation on, and they replied: "We give you your choice." And she rejoined, "I have no choice." The Secretary undertook to read an order of dismissal, but was interrupted by various members urging plaintiff to resign. At last he succeeded, after some half hour, in reading an order of dismissal as follows:

"We hereby dismiss Miss Frances Copass from Hall-Moody Institute on account of failing to comply with the demands of the Trustees."

She then requested to be informed what demands she had refused, and the reply was: "You understand." She persisted in further explanations as to the demands, but was refused, and the interview closed. She requested another meeting, after one of the Trustees returned to the city, who was not present at the former meeting; and after the conference had progressed, some time

asked for a definite statement of the charges against .her, when, on motion of the Secretary, it was resolved they would not state definitely the grounds of their action, and after .assuring her that they acted with great .deliberation, they adjourned. She sought and was granted another interview with the Board, and expressed great regret at the result of the matter, and wanted to get at the bottom of it; said that . if she had done anything wrong, she was sorry, and wanted to be reinstated. She told them that she had no doubt that from their standpoint they had acted conscientiously, and she was anxious to adjust the matter. They promised to take the matter under further consideration, but on the next day notified her that the decision was final, paid her up to date of her discharge, and imposed her duties on other teachers. She attempted to 'get other employment there and elsewhere, and failed, and then brought suit for the balance due her for the unexpired term.

It appears that plaintiff was in the Institute for four and one-half months, and her testimony, as well as the weight of the evidence, is that she had callers and visitors about sixteen times, or about one a week. There is much conflict on this point, however. The jury had the plaintiff before them and saw her appearance and demeanor, as well as that of other witnesses, and they were of the opinion that she had not dam-

aged the school in this way, or they could not, under the charge, have found in her favor. Under this feature of the case there is a conflict of testimony, but the jury has seen proper to believe the plaintiff's view of the case, and there is evidence to sustain their finding. There is some evidence that upon one or two occasions when she had been to an entertainment, she sat up and had company until near 12 o'clock. The jury did not believe she was in such error in so doing as to impair her influence or warrant her discharge. The members of this Court have been known to sit up until 12 o'clock at night. It is true they have the company of very entertaining records, and, in the consideration of contingent remainders, executory devises, and the class doctrine, the time passes without any note, so that we cannot, at least over the verdict of the jury, say that an occasional staying up until 12 o'clock, with pleasant company, is excessive. We are not aware that we have been rendered less efficient by such hours. Indeed, this seems to be the settled policy of the State, and we have heard of no criticism on this account; and there seems now to be a disposition to allow such members of the Court as desire to do so to continue the practice.

Upon the other feature of the case, that is, the efficiency of the plaintiff, there is also much proof, and it is also contradictory. The chief

complaint is that she could not maintain order in the study hall. We have already adverted to the difficulty attending this part of her duties. It appears that on two occasions marbles were rolled across the floor. They evidently came from the boys' side. The girls were dismissed and the boys lined up and put on honor, when it was revealed that none of them did it. The marbles evidently got loose and rolled themselves, while the teacher's back was turned. A lap rug was thrown across the hall, but this was also done surreptitiously. The boys would look at the girls and the girls would look at the boys, and both would smile when there was no apparent occasion for such conduct, and when the teacher's back was turned. Other things of like character were done, but the teacher was always kept uninformed of these matters until after they had happened. It is evident she had no small task before her to keep sixty-five boys and girls in order, some large and some smaller, but all imbued with the sense of fun and mischief. The Court charged in substance that she was bound to use diligence to keep order, but could not be held to be a guarantor, and the jury were evidently of the opinion she did all she could, as she states, and there is evidence to sustain this view.

The plaintiff was required to teach a class in zoology. In order to do this, it was directed by the principal that the pupils should go out into

the open fields, with the plaintiff in charge. The principal reported that after they had gone, he followed and found the plaintiff and pupils paired off by couples, eating watermelons. The plaintiff's version of this is that the plan of operations was to take a mosquito bar and, holding it by the corners, used it as a drag-net to catch all the bugs, worms, butterflies, grasshoppers, frogs, and other objects they could and take them to the Institute for dissection and study at leisure; a practice similar to medical students in search of subjects for dissection. It seems that some of the boys, in carrying the drag-net through the field of Mr. Farmer, one of the Trustees, caught some watermelons. They gallantly shared them with the girls, and while the melons were being dissected on the ground, being too heavy to carry to the Institute, the principal appeared. It appears that there were three girls and six boys in this zoological class. The only criticism the principal made at the time was that perhaps it would be best to divide the class thereafter. The jury thought undoubtedly no great injury had been done in this matter.

All these matters and many others of like character were placed before the jury, and commented on with great eloquence by counsel, and the jury, after a deliberation of five minutes, returned a verdict for the plaintiff. The charge of the Court is correct, and lays down a proper

rule. There is evidence that the young lady was diligent, that she was not derelict in her duties, that she did the best she could with the material she had, and we can see no ground to disturb the verdict of the jury. It appears that most of the disorder in the school was caused by the sons of Trustees, and they are the principal witnesses against the plaintiff as to these disorders, of which they were well posted, but plaintiff knew nothing, and some of them, notably Mr. White, was a witness as to his improper visits socially to the plaintiff, when she supposed he had a permit to come. No imputation is cast upon the character of the young men who paid attentions to the plaintiff. It is agreed that they are the cream of Martin society, intelligent and refined, and one polished by years of foreign travel, and one of them a prominent member of the bar and a practitioner in this Court. It was attempted to show that one of them was an insurance agent, and that the plaintiff was never introduced to him, but, nevertheless, talked to him and walked with him. Plaintiff explained her relation to him no doubt satisfactorily to the jury, as it is to this Court. Besides, the well-known modesty and retiring disposition of insurance agents is *prima facie* evidence that he was a gentleman, as the proof demonstrates he was.

It is insisted that a new trial should have

been granted because of undue pressure and influence brought to bear on the jury by the public at the trial. The motion for a new trial was supported by the affidavit of six trustees, who were also witnesses in the case. Their affidavits state in substance that the case attracted a great deal of attention and interest in Weakley County, and that the court-room was crowded with partisan adherents of the plaintiff; that they filled up the space allotted for the spectators, and also the bar, and crowded around the jury; that they manifested their approval of plaintiff's case by applauding her attorneys, by handclapping, and other means in the presence of the jury; that they shook their heads and smiled and frowned, and by other facial expressions manifested their approval or disapproval as the case progressed; that on the close of the speeches of counsel for plaintiff, there was a vigorous applause by handclapping and otherwise, and this tended to influence the jury; that inflammatory utterances were made by her counsel; that the case was talked about in the presence and hearing of the jury by the friends of the plaintiff, both ladies and men, and the hope and belief was expressed that the plaintiff would win her case; that the shops and stores, the offices and public places, streets and business houses, the court-house and hotels were filled with her friends, male and female, talking and commenting about the case; that the jury, in

consequence, did not take time to consider the verdict, or read the charge, or weigh the evidence, but returned with a verdict for plaintiff within five minutes after retiring; that its delivery was loudly cheered, and she and her attorneys were openly and profusely congratulated on the result; that the public sentiment was molded in · plaintiff's favor by public comment on the streets and in the press, so that a fair and impartial trial was not had.

The sworn statements of the Clerk of the Court and of the jury. was introduced to the effect that while there was a large crowd present, and much interest manifested, no remarks were made by spectators in the presence of the jury. There was applause by both parties in the court-room and in the presence of the jury, which the Court, on each occasion, suppressed, and on each occasion rebuked the audience. The jury state that they were in nowise and to no extent influenced by these manifestations. Some of them stated that they knew public feeling was high, but could not tell whether it preponderated in favor of one. side or the other; that they were not approached nor talked to by the friends of either; that the Trustees, some of the witnesses, and many of the friends of the institution appeared in court with the badge of the institution displayed on their bosoms or collars; that they based their decision on the law and the facts; that they were not

Hall-Moody Institute *v.* Copass.

influenced by public sentiment or manifestations, and that they disapproved of the applause and considered it out of place. Counsel for plaintiff states that the first applause occurred at a sharp answer to plaintiff's attorney; that there was no applause during speeches, but laughter; that there was never any applause, but hand-clapping, and no cheering at any time, and that the applause was promptly checked and rebuked whenever it occurred; that no exception was taken to any of it at any time by defendant's counsel. We are satisfied that the efforts of counsel on both sides merited (if the propriety of the case would permit) a great deal more applause than was in fact given. Faint echoes of their eloquence has even reached this Court, and on this feature of the case the parties are well balanced. The trial Judge overruled the motion for a new trial, and we must assume that he properly exercised his discretion in so doing. He was present and saw the entire proceedings, and being satisfied that a fair trial had been had, he did not grant a new trial, and we cannot see that he was in error.

The judgment of the Court below is affirmed, with costs.