JOHN QUINCY ADAMS, Respondent, v. UNIVERSITY HOSPITAL, Appellant.

Kansas City Court of Appeals, January 14, 1907.

1. **NEGLIGENCE: Treatment of Patient: Res ipsa loquitur: Servant.** A patient in a hospital after an operation and before recovery from the influence of the anesthetics, was burned and materially injured by hot water bottles. *Held*, that the injury unexplained sufficiently showed culpable negligence whether the hospital (if liable at all), was liable for the negligence of its servants or for its own negligence in selecting them.

2. ————: **Charities: Non-Liability: Patients.** A charitable institution, such as a hospital for the treatment of diseased and injured persons, is not liable for the negligence of its servants, nor of its managers in the selection of its servants, since the public are concerned in the maintenance of such institutions and one accepting the service thereof, does so upon the implied assurance that he will assert no claim, which would in effect totally or partially destroy the charity.

3. ———: ———: ———: **Patient's Rights.** Any one in the present or the future coming within the object of a charity, has the right to the enjoyment of its benefits; and no one has a right to appropriate to himself in settlement of claims the fund where by those benefits are secured. (English and American cases considered.)

4. ———: ———: **Charter: Hospital.** The defendant hospital's charter granted under chapter 12, article II, Revised Statutes 1899, is examined and it is held a charitable institution, and the fact that pay patients are admitted does not make it liable for the negligence of its managers and servants.

Appeal from Jackson Circuit Court.—*Hon. John G. Park,* Judge.

REVERSED.

*Boyle, Guthrie & Smith* for appellant.

(1) There was no evidence of any negligence under any law, whether applicable to charities or otherwise. Gorson v. Mfg. Co., 186 Mo. l. c. 307; Caudle v. Kirkbridge, 117 Mo. App. l. c. 417. (2) A charitable corporation is liable neither for the negligence of its servants nor negligence in the selection of servants. Ins. Patrol v. Boyd, 120 Pa. St. 624; Wiliamson v. Industrial School, 95 Ky. 251; Perry v. House of Refugees, 63 M'd. 20; Parks v. Northwestern University, 218 Ill. 381; Hearns v. Waterbury Hospital, 66 Conn. 98; Downes v. Harper Hospital, 101 Mich. 555; McDonald v. Hospital, 120 Mass. 482; Joel v. Hospital, 89 Hun 73; Benton v. Trustees, 140 Mass. 13; M'aia v. Eastern Hospital, 97 Va. 507. (3) There was no evidence that the hospital was negligent in the selection of competent servants. (4) If the servants were incompetent, Adams through his physician, his representative in that respect, was equally culpable with the hospital in assuming their competency.

*Haff & Michaels, L. W. McCandless* and *D. C. Ketchum* for respondent.

(1) The injuries sustained by respondent were occasioned by the negligence of appellant's nurses, and not otherwise: The maxim, *"res ipsa loquitur,"* applies. Dougherty v. Railroad, 9 Mo. App. 478; s. c., 81 Mo. 325; Hill v. Scott, 38 Mo. App. 370; Gallagher v. Edison I. Co., 72 Mo. App. 576; Sackewitz v. Mfg. Co., 78 Mo. App. 144; Raney v. Lachance, 96 Mo. App. 479; Blanton v. Dold, 109 Mo. 64; Dorsey v. Railroad, 83 Mo. App. 528; Shuler v. Railroad, 87 Mo. App. 618; Moorman v. Railroad, 105 Mo. App. 711; Olsen v. Railroad, 152 Mo. 426. (2) The law is settled that a hospital is liable for furnishing incompetent servants. Holmes on the Common Law, 7, 35; Glavin v. Hospital, 12 R. I. 411; Murtaugh v. St. Louis, 44 Mo. 479; Haggerty v. Railroad, 100 Mo. App. 424; 15 Am. and Eng. Encyl. of Law (2 Ed.), 763; Laubheim v. Steamboat Co., 107 N. Y. 228; Railroad v. Artist, 60 Fed. 365; McDonald v. Hospital, 120 Mass. 432; Joel v. Hospital, 89 Hun 73; Hearns v. Hospital, 66 Conn. 98. (3) The nurses were negligent and incompetent and the evidence showed it. Holladay v. Kennard, 79 U. S. (12 Wall.) 254; The Elton, 131 Fed. 562. (4) Adams did not assume the nurses' incompetency.

ELLISON, J.—The plaintiff was a patient at the defendant's hospital, whither he had gone to have a surgical operation performed upon him. While yet under the influence of an anesthetic, administered for the purpose of the operation and after the performance of the operation, he was placed in the charge and care of one or more of defendant's nurses, who, it is charged, were not competent and by reason thereof they permitted him to be severely burned on the legs by rubber bottles filled with hot water whereby he was painfully and permanently injured. He brought the present action against

the defendant for damages and prevailed in the trial court.

Serious injury to plaintiff was shown and the defendant's main contention is that it is a benevolent or charitable institution and as such is not liable to an action for damages caused by the acts of its employees; that, as such an institution, it is exempt from application of the doctrine of *respondeat superior*. Defendant insists that it is neither liable for the negligence of its servants, nor for its own negligence, if any, in undertaking to select competent servants. Upon the other hand, the plaintiff contends that there is liability, if there was negligence either of the servant, or of the defendant in selecting a competent servant.

We will say, at the outset, that if defendant's liability is to be ascribed to the negligence of its nurses, the manner of his injury was such as to authorize the rule of *res ipsa loquitur* to be invoked. [Olsen v. Railroad, 152 Mo. 426; Johnson v. Railroad, 104 Mo. App. 588; Dougherty v. Railroad, 9 Mo. App. 478.] And if such liability is to be based upon the negligence of defendant in selecting competent nurses, that rule will also apply. For, in either case, the injury is, of itself, a sufficient showing, unexplained, that it resulted from one or the other of these sources of negligence, and we see no reason why the defendant (if liable at all) should not be held to be obliged to exculpate itself by showing, in the latter instance, that it had used proper care in the selection of its nurses, as it would in the former by showing that the nurses had not themselves been negligent.

If the questions made in this case have been heretofore decided in this State, it has escaped our attention. No case has been cited. That of Murtaugh v. City of St. Louis, 44 Mo. 479, involved the liability of a municipality for injuries received in a city hospital and it was held that the city was not liable. The decision is put upon the ground that a city is not liable for acts of its officers

in administering a corporate franchise conferred for the general public good. That of Haggerty v. Railroad, 100 Mo. App. 424, did not involve the question of the exemption of charitable institutions. The St. Louis Court of Appeals ruled that a department organized by the railway company, known as the relief department, was not a charity, but that it was merely a business arrangement of the employees of the company. The question as presented here relates to the liability of a private, or quasi-private, charity for damages caused by the negligent acts of its employees, or by its own negligent act in employing incompetent employees.

We will assume that the evidence tends to show the plaintiff was injured either by the negligence of one of defendant's nurses or by her incompetence. If by the latter, we will assume, for the purpose of disposing of the case, that there is enough in the record to justify a verdict that the defendant was careless in selecting her. But as, in our opinion, the defendant is neither liable for the negligence of one of its employees, nor for its own negligence in selecting an incompetent employee, it can make no difference which of the two acts caused the injury. Every member of the public is interested in the building up and maintenance of a charitable institution designed for the alleviation of human suffering; and every one may be supposed to be concerned in such institution, and to be a party to a line of action or conduct which would disable every other from doing anything which has a tendency to prevent the institution from performing the functions intended by its founder. The State itself is concerned that its citizens may be restored to health, and to that end may have places always open where those in need may obtain relief. So it may be said that any citizen who accepts the service of such institution (it making no difference whether in any special instance he pays his way) does so upon the ground, or the implied assurance, that he will assert no com-

plaint which has for its object, or perhaps we should say, for its result, a total or partial destruction of the institution itself. If an organization for charitable purposes, founded upon the bounty of others who supply funds for the purpose of administering relief to those in need of relief, and of extending aid, care and protection to those who have no one to call upon by the ties of nature, may have its funds diverted from such kindly purpose, would it not inevitably, operate to close the purses of the generous and benevolent who now do much to relieve the suffering of mankind? Let us see what the practical result might be. With a view of supplying care, protection and education to dependent children without parents, some good man puts in trust for building an orphans' home the sum of twenty-five thousand dollars; and for its perpetual maintenance the further sum of one hundred thousand dollars, to be put at interest or otherwise invested. The trustees may unfortunately without proper inquiry or care employ an incompetent servant. That servant, in the first year's existence of the home, may, from ignorance, or from negligence, do, or omit to do, something causing damage which, under our liberal measure of compensation for personal injuries, would be sufficient to take up the whole fund, and thus, for a single mishap, the generous object of the donor would be thwarted; and what was intended as perpetual relief to succeeding generations of helpless children would be wiped out. That funds supporting organizations for charity cannot be thus diverted, in other words, that charitable institutions or corporations are not liable for the negligence of an employee, nor for the want of care in the selection of an employee is sustained by authority and by reason.

The question arose in England and was decided in the House of Lords. [Heriot's Hospital v. Ross, 12 Clark & F. 507.] In that case Heriot, a jeweler, by his will, in the year 1623, left a large part of his estate to

certain officers of the city of Edinburgh in perpetuity for the founding and maintaining a hospital for the "maintenance, relief, bringing up and education of so many poor fatherless boys, freemen's sons of that town, as the means which I give, and the yearly value of the lands so purchased shall amount and come unto." The hospital was to be governed by rules formulated by a certain doctor named in the will. The rules, as framed, admitted to the hospital boys between certain ages. More than two hundred years after it was founded, a boy, alleging that he was wrongfully excluded, brought his action against the foeffees of the hospital in their official capacity, for damages. Opinions of Lords Cottenham, Brougham and Campbell are reported which are remarkable for the vigor with which they assail the proposition that the funds of the charity may be diverted to the payment of damages for malfeasance of the trustees. Lord Campbell pronounced the suggestion that persons damaged could be indemnified out of the trust fund to be "contrary to all reason, and justice, and common sense." He stated that there was "not any authority, not a single thread to support" such view of the law. In reversing the decree of the lower court he further stated that, "It is to be hoped that we shall never again hear of a decison like the present, contrary to reason, sense and justice." In the course of their opinions, the judges refer as authority to the case of Duncan v. Findlater, 6 Clark & F. 894. That case has been overruled in Mersey Docks v. Gibbs, L. R. I. H. L. 117 (same case in 11 H. L. Cas. 720; 1 Eng. and Irish Appeal Cas. 93) and was therefore not followed in as late case as that of Gilbert v. Corportation of Trinity House, L. R., 17 Q. B. 795. From the fact that Duncan v. Findlater was stated to be authority supporting the holding in Heriot's Hospital v. Ross, and that the former was afterwards overruled, the notion came to prevail, in some quarters, that the latter case was also discredited. But an examination of

the cases, and others of similar character, will disclose that they belong to different classes and that the principle or foundation upon which they rest is radically unlike.  One class involves the right to divert charity funds from the object of the donor by appropriating them in payment of damages caused by the neglect of the trustees; the other involves the liability of public corporations (not charitable) for the negligence of trustees or other officers in charge thereof.  It is not necessary to refer to the rule as to liability of corporations in this country, or to differences which may exist between the rule adopted in this State and that applied in England, whether such corporation be private trading corporations, or governmental, or partly both.  It is sufficient for present purposes to know that Heriot's Hospital v. Ross, involving a case of a distinct and wholly different class, has not had its value at all abated by the other cases.  Duncan v. Findlater was an action against the trustees of a public road (appointed under a statute) and was for injury to one travelling at night, by reason of defects in the highway.  The decision was that the road fund was not to be subject to such damages.  It was overruled, as above stated, in Mersey Docks v. Gibbs, a case where trustees, who were by statute in charge of a harbor and docks, suffered them to become obstructed with mud so that a ship and cargo were damaged.  It was decided that the corporation was liable for the negligence of the trustees, and Duncan v. Findlater was overruled.    But the ground of objection to Duncan v. Findlater was not a ground which can apply to the reason for the rule which supports the exemption of charities.    The Mersey Docks were authorized by act of Parliament and were entitled to receive port dues and apply the same to the improvement of the harbor and maintaining the docks, to the payment of debts and after such debts were paid, the trustees were required to lower and reduce the rates

"as far as can be done, leaving sufficient for defraying all charges of management and other concerns of the docks, etc., and improving, repairing and maintaining the same, and for carrying into execution the provisions of this act and former acts." While, in the course of the opinion, strong objection is taken to Duncan v. Findlater in deciding no liability existed for negligently permitting a defective highway, yet the ground upon which the case is put turned upon a construction of the acts of Parliament authorizing the trustees to take charge of the harbor and docks (see pages 104, 107, 118). At page 107, Justice BLACKBURN said that, "Corporations like the present, formed for trading and other profitable purposes though such corporations may act without reward to themselves, yet in their very nature they are substitutions on a large scale for individual enterprise. And we think that in the absence of anything in the statutes (which create such corporation) showing a contrary intention in the Legislature, the true rule of construction is, that the Legislature intended that the liability of corporations thus substituted for individuals should to the extent of their corporate funds, be co-extensive with that imposed by the general law on the owners of similar works." The case decided in Queen's Bench (Gilbert v. Corporation of Trinity House, supra) is decided on the same principle as that which governed the Mersey Docks case. It was a case where the care and management of all lighthouses and beacons in England and adjacent seas were vested in Trinity House and the corporation was held to be liable for the negligence of one it licensed to remove a partially destroyed beacon.

It seems clear to us that those cases, and others of like character, should not be thought to be in conflict with those which have steadily maintained the rule exempting the diversion of funds set apart for the support of charitable institutions. We have not been advised of any case in England which has doubted the authority

of Heriot's Hospital v. Ross. And though it was cited in Mersey Docks v. Gibbs, it is not questioned or mentioned by the court, undoubtedly upon the ground that it did not depend upon like considerations. Indeed, afterwards, in a case in the House of Lords involving the liability of the Mersey Docks to be rated for taxation, Justice BLACKBURN, who delivered the opinion in the case of Mersey Docks v. Gibbs, *disclaimed that that case involved considerations applicable to charities.* In the course of his opinion at page 465 of the report, he said that there were "several cases relating to charities which were mentioned at Your Lordships' bar, but were not much pressed, nor, as it seems to us, need they be considered now; for, whatever may be the law as to exemption of property occupied for charitable purposes, it is clear that the docks in question can come within no such exemption." [Mersey Docks v. Cameron, 11 H. L. Cas. 443.]

In this country, whatever conflict in the authorities may appear, has arisen from applying rules to charities which (as we have just seen) were laid down as governing an entirely different class of cases — cases clearly involving governmental function, or substitutes for private enterprise. A fund arising from charges against shipowners for use of docks for landing, unloading and storing freight; a fund arising from toll taken of those using a public highway, and the like, are matters of business, or, are of quasi-governmental concern, which bear no likeness to the funds which are provided by the generosity of donors for the perpetual alleviation of suffering and for the betterment of the health and moral being of mankind. In the former class, it may be well enough to say, that the law intended the fund to make good an injury which its managers may inflict. But in the latter, it would be against every principle of right and an outrage on justice to deplete a fund set aside for perpetual charity, by using it in paying damages caused

by the acts of those engaged in administering the trust. Charity funds are things apart from ordinary matters of business or trade. In the thoughts and consciences of men, charities are not loaded with the burdens put upon other matters. Charity suggests different considerations and treatment from matters of ordinary business, and hence there has arisen out of the conscience, a principle which protects it in its beneficent and perpetual purpose. The greatest authority has said that though prophecies shall come to naught, and tongues shall cease, and knowledge shall vanish away, yet. "Charity never faileth." That and other statements of like tenor, though perhaps referring to mental conditions, have doubtless done much to foster the privileges which have ever been accorded to material benevolence.

To repeat a thought already suggested: every one, in the present *or the future,* coming within the object of a charity, has a right to the enjoyment of its benefits; and no one has a right to *appropriate to himself* in settlement of claims, the fund whereby those benefits are secured. To permit it to be done would be, not only setting aside the purpose of the donor, but would, in its results, allow the claim of one person to exclude the rights of all others who may come after him.

It would be a matter of grave concern and regret if funds set apart for support of our charitable institutions should be made subject to the assaults of the damage-claimant, and be called upon, not only for compensatory recompense, but to stand for punishment in the way of exemplary damages. Especially would it strike one as unfortunate, when it is realized that such claimant has his primary right to hold to the strictest accountability the individual who does him the injury for which he makes complaint; and that in denying him the right to impoverish benevolence we do not deny him a remedy against the actual wrongdoer.

So the weight of authority in this country supports

Heriot's Hospital v. Ross as being the rule which commends itself, not only because it carried out the donor's intention, but because it is more reasonable and just and better subserves an enlightened public policy. [Parks v. University, 218 Ill. 381; Fire Ins. Patrol v. Boyd, 120 Pa. St. 624; Williamson v. Louisville Reform School, 95 Ky. 251; Perry v. House of Refuge, 63 Md. 20; Maia v. Eastern Hospital, 97 Va. 507; Downes v. Harper Hospital, 101 Mich. 555; M'Donald v. Hospital, 120 Mass. 432; Benton v. Trustees, 140 Mass. 13.]

We have found but one case (Glavin v. Rhode Island Hospital, 12 R. I. 411) which takes ground against the view we have endeavored to set forth; and that does not do so in such pronounced way as has been said. It is there conceded (p. 428) that only the income of the institution could be held. But whatever breadth the case may be thought to have, we learn from Parks v. University, supra, that the Legislature of the State of Rhode Island has since nullified the effect of the decision.

In the two cases last cited from the Supreme Court of Massachusetts, that court, while upholding the doctrine as stated by us, yet makes use of language in the opinions which leaves room for an inference that a liability might attach if the corporation had been negligent in selecting its surgeons in the one case and its superintendent in the other. The case of Hearns v. Waterbury Hospital, 66 Conn. 98, 123-127, seems to concede that there would be a liability for negligence in selecting employees, but no liability for the negligence of the employees themselves, if selected with due care.

But it is manifest that if we uphold a rule which would make an institution of charity liable to a patient who has been injured by an incompetent servant, negligently selected, we destroy the principle we have endeavored to make plain, that charitable trust funds cannot be diverted from the purposes of the donor. For it can make no difference, so far as the integrity of the fund

is concerned, whether it be sought after by one who is injured by the negligence of a servant, or the negligent selection of such servant.

There are authorities which very properly hold that where ship companies keep a physician on board (even though required to do so by law) to serve those who may choose to call him, he is not to be regarded as the company's servant, since his mode and manner of service is not under the control of the company. And that physicians and nurses which may be provided by railway companies at their hospitals (or the hospitals of employees) are not, for the same reason, the servants of the railroad. They are not charities, but are nothing more nor less than business associations formed for business purposes. [Haggerty v. Railway, supra.] But cases of that class do not reach the question here involved. For decisive considerations which arise in the one are not found in the other.

Plaintiff refuses to concede that the defendant is a charity hospital. If it is not, it would be liable to this action though such institutions were exempt. We are, however, of the opinion that it is a charitable institution. It is established under chapter 12, article 11, Revised Statutes 1899, providing for the organization of benevolent, religious, scientific, etc., associations. Its charter provides that, "The object of this association shall be to conduct and control the institution known as the 'University Hospital,' now owned and controlled by the University Medical College of Kansas City, to provide medical treatment free of charge for the poor, and to train and educate professional nurses, and to confer upon them a degree." There was no stock, nor dividends, and everything realized from an income by payments from paying patients went to the improvement of the hospital and the maintenance of an equipment. Surgeons and physicians made no charge and people who could not pay, even for board, were, by the rules,

to be received free. Other places known as free institutions, were furnished by defendant with physicians, nurses and medicines, gratuitously. It is true that a large body of patients seeking relief with defendant paid their way, some more and some less, and plaintiff himself was a "pay patient." But that circumstance amounts to no more than a contribution by such persons to the support of the institution. The authorities are that such circumstance does not alter the character of the institution. [Downes v. Harper Hospital, 101 Mich. 555; Parks v. University, 218 Ill. 381; McDonald v. Hospital, 120 Mass. 432.]

Concluding, as we have, that the defendant is not liable to the action, and that plaintiff's remedy is against those who may have inflicted the injury upon him, we reverse the judgment. The other judges concur.