IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## WESTERN DIVISION

### NASHVILLE, DECEMBER TERM, 1917.

MARY A. GAMBLE *v.* VANDERBILT UNIVERSITY *et al.*

(*Nashville.* December Term, 1917.)

1. **CHARITIES.** Liability for negligence. Negligence in operation of elevator in income. Producing office building.

To the extent of income derived from its office building, operated largely for profit and separately from the rest of its educational plant, though occupied in part by its law school and library, Vanderbilt University was liable to the widow of a lawyer, tenant in the building, for his death in an elevator accident due to negligence, though the university was a charity, and the general rule is that charitable trust funds are not to be depleted by subjection to liability for negligence. (*Post, pp.* 623-634.).

Cases cited and approved: Abston v. Waldon Academy, 118 Tenn., 24; Powers v. Massachusetts Homeopathic Hospital, 47 C. C. A., 122; Bruce v. Central M. E. Church, 147 Mich., 230; Hordern v. Salvation Army, 199 N. Y. 233; Basabo v. Salvation Army, 35 R. I., 22; Fire Insurance Patrol v. Boyd, 120 Pa., 624; Fordyce v. Woman's Christian National Library Association, 79 Ark., 550; Whittaker v. St. Luke's Hospital, 137 Mo. App., 116; Perry v. House of Refuge, 63 Md., 20; Hearns v. Waterbury Hospital, 66 Conn., 98; Duncan v. Nebraska Sanitarium, etc.,

[138 Tenn.

Gamble v. Vanderbilt University

Ass'n, 92 Neb. 162; McDonald v. Massachusetts General Hospital, 120 Mass., 432; Thornton v. Franklin Square House, 200 Mass., 465; Parks v. Northwestern University, 218 Ill., 381; Taylor v. Protestant Hospital Ass'n, 85 Ohio St., 90; Adams v. University Hospital, 122 Mo. App., 675; Gable v. Sisters of St. Francis, 227 Pa., 254; Jensen v. Maine Eye & Ear Infirmary, 107 Me., 408; Lindler v. Columbia Hospital, 98 S. C., 25; Vermillion v. Woman's College of Due West, 104 S. C., 197; Farrigan v. Pevear, 193 Mass., 147; Heriot's Hospital v. Ross, 12 Clark & Finnelly, 507; Bennett v. Wyndham, 4 De G., F. & J., 258 Vanderbilt University v. Cheney, 116 Tenn., 259; Holden v. Massachusetts Horticultural Society, 211 Mass., 370; McInerny v. St. Luke's Hospital Ass'n, 122 Minn., 10.

Cases cited and distinguished: Winnemore v. Philadelphia, 18 Pa. Super. Ct., 625; Fordyce v. Woman's Christian National Library Ass'n, 79 Ark., 550.

2. CHARITIES. Liability of agents for negligence to third person. "Misfeasance."

The executive committee of Vanderbilt University, its intermediate agents, charged with the supervision and operation of its office building, including the passenger elevator, were liable to the widow of a tenant in the building killed in an elevator accident, the committee having permitted the use of the elevator in a defective condition with knowledge, since, when an agent undertakes the performance of his agency, he is liable to third persons for negligence therein, that is, for nonfeasance an agent is responsible to his principal only, but for misfeasance may be responsible to third persons; "misfeasance" being a failure to use, in the performance of a duty owng to an individual, that degree of care, skill, and diligence which the circumstances reasonably demand. (Post, pp. 634-639.).

Cases cited and approved: State v. McClellan, 113 Tenn., 616; Osborne v. Morgan, 130 Mass., 103; Hagerty v. Ore Co., 38 Mont., 69; Consolidated Gas Co. of Baltimore City v. Connor, 114 Md., 140; Mayor v. Thompson-Hutchison Building Co., 104 Ala. 611; Wines v. Crosby, Ann. Cas. 1913D, 1055. Tippecanoe

L. & T. Co. v. Jester, 180 Ind., 357; Nunnelly v. Iron Co., 94 Tenn., 397; Drake v. Hagan, 108 Tenn., 265; Lumber Co. v. Sessler, 128 Tenn., 665.

FROM DAVIDSON.

Appeal from the Circuit Court of Davidson County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—A. G. RUTHERFORD, Judge.

PITTS & McCONNICO and A. F. WHITMAN, for appellant.

CHAS. C. TRABUE and JORDAN STOKES, SR., for appellee.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This was an action brought in the circuit court of Davidson county against Vanderbilt University and its executive committee to recover damages for injuries inflicted upon the plaintiff's intestate by the falling of an elevator in an office building owned and operated by the university.

The first count of the declaration contains all of the matters necessary to be considered in connection with the demurrer on which the questions for decision arise.

This count contains the following averments.

"(1) That defendant Vanderbilt University is a corporation created and organized under the laws of Tennessee and having its *situs* at Nashville, in said State, and is engaged, and has been for many years, among other things, in the renting and operation of a large building for office purposes, owed by said defendant and situated at Nos. 311 and 313 Fourth Avenue North, formerly Cherry street, in the heart of the business district of said city of Nashville and remote from and wholly separate and distinct from its university buildings and grounds, which are situated in the suburbs of said city.

"(2) That said building consists of five stories, besides a basement, and contains numerous offices which are and have been for many years rented out annually to business and professional persons, firms, and corporations wholly disconnected with said Vanderbilt University or its educational work, in like manner in all respects as other office quarters are owned and rented out to tenants by other property owners of said city, and from whom are collected monthly rentals by said defendant in like manner in all respects as such rentals are collected by other landlords from their tenants in said city.

"(3) That said defendant owns, maintains, and operates in said building, and has done so for many years, an elevator for the use of its tenants therein, in like manner in all respects as elevators are owned,

maintained and operated by other owners in other office buildings in said city.

"(4) That only a small part of said building is and has been at any time used by said defendant for its law department, and for its law library for the use of its law students, and the larger portion of said building is and has been for many years rented out, as aforesaid, to tenants as business offices, and the principal use to which the said building is and has always been devoted is that of rented offices, and from which said defendant derives a large annual income, to wit, the sum of between $5,000 and $10,000, and the rentals charged and collected are the full, usual, and customary rates charged for similar offices in said city.

"(5) That said defendant owns and operates and has for many years owned and operated other buildings in the business portions of said city of Nashville, which it rents out and has rented out for many years for business, hotels, banking, and residence purposes, to persons, firms, and corporations in no way connected with its university of institution of learning, and from which it receives and has been for many years receiving an annual income of many thousands of dollars—in fact, said defendant is and has been for many years one of the largest business property owners of said city of Nashville.

"(6) That the foregoing facts and conditions existed at and before the time of the injuries hereinafter complained of.

"(7) That at and before the time of the injuries complained of defendants J. H. Kirkland, W. R. Cole, G. M. Neeley, and Jno. B. Ransom were members of the executive committee of said defendant Vanderbilt University, and as such had charge and control of the building aforesaid on Fourth Avenue North, and they and their associates and their appointees, agents, servants, and employees were charged with the duty of supervision, management, and operation of said building and the elevators therein.

"(8) That plaintiff's said husband, Tip Gamble, at and before the time of the injuries herein complained of, was a tenant of defendants, occupying an office on the fourth floor of said building of defendants at 311 and 313 Fourth Avenue North, to wit, in the year 1908.

"(9) That on or about the 25th day of November, 1908, during business hours, the plaintiff's said husband, a lawyer, being at that time a tenant of said building as aforesaid, and lawfully therein, entered the said elevator at the said fourth floor, for the purpose of descending to the street or first floor, the said elevator being at the time in charge of and operated by a temporary servant of defendants, and not the regular operator or conductor, when, as the said elevator descended, the said temporary operator or conductor, by reason of his negligence and incompetence, and the defective, worn, and unsafe condition of the said elevator, lost control thereof and it fell rapidly to the bottom, where the violent and sudden stop and con-

cussion so severely jarred and injured plaintiff's said husband that, by reason of such violent and sudden concussion and injury which was wholly without any fault 'or negligence on his part, he suffered great bodily and mental pain and anguish, and was forced to incur, pay out, and expend a large sum of money, to wit, the sum of $1,000, for medical and other treatment and service in and about efforts for his cure for a long space of time, to wit, until the 2nd day of January, 1909, when, as the result of said injury, he died.

"(10) And so the plaintiff avers that the death of her said husband, Tip Gamble, was caused by the negligence of the defendants and their agents, servants, and employees in suffering and permitting the said elevator and its braking and controlling aparatus and machinery to be, become, and remain defective, worn, out of repair, unsafe, and insufficient to control the movements of said elevator and so as to render said elevator unsafe and dangerous to tenants and other persons lawfully in said building, and which defects were known to defendants and not known to plaintiff's said husband; and also by the negligence of defendants in employing and placing in charge of said elevator an unskilled, inexperienced, and incompetent servant as conductor or operator thereof, and whose inexperience and incompetency resulted in his loss of control or inability to control the movements of said elevator; and also by the negligence of the said temporary operator or conductor in failing to operate the same

with reasonable care—to plaintiff's damage $25,000, and therefore she sues and demands a .jury to try the cause.''

There are several grounds of demurrer, but we need consider only the third, which presents the point that the defendant corporation is a charitable institution, and, as such, holds its funds in trust for eleemosynary purposes, and therefore it cannot be held liable in damages for the injuries complained of.

This ground of demurrer was sustained in the trial · court, and also in the court of civil appeals, and the case is now here on the writ of *certiorari* to the latter court to review its decision.

We shall defer, for the present, the consideration of the case of the executive committee.

It is conceded by the plaintiff that the defendant is a charitable institution, and the counsel for the latter have so treated the case. Therefore we need not consider whether the declaration charges the fact with sufficient clearness.

The question for determination is whether the .defendant charitable corporation is exempt from liability in an action of damages for the tort averred in the declaration.

We had occasion to consider the general subject in *Abston* v. *Waldon Academy,* 118 Tenn., 24, 102 S. W., 351, 11 L. R. A. (N. S.), 1179. In that case it was held that the defendant, a charitable corporation, was not liable for an injury to one of its students

caused by the negligence of its servants. We adopted what is known in this class of cases as the trust theory. The general reason given was that to permit the payment of such damages would result in a diversion of the trust fund from the purposes to which it was devoted by the donor. Another general idea was that the tolerance of such liabilities would, in many cases, eventuate in the destruction of the charity, with a consequent discouragement of donors, to the detriment of the public welfare. The case, if the court had conceded the doctrine, might well have been decided on the narrower ground to which many of the modern cases are confined, and on which some of the authorities even at that time stood, to the effect that a beneficiary of the charity, in consideration of the privileges enjoyed, must be presumed to have waived any right to damages of the right kind referred to. The court, however, with all the authorities before it then in existence, decided to adopt the broader view as being most in accord with sound public policy. We are still of that view, although we do not undervalue the very able opinions (*Powers* v. *Massachusetts Homeopathic Hospital,* 47 C. C. A., 122, 109 Fed., 294, 65 L. R. A., 372; *Bruce* v. *Central M. E. Church,* 147 Mich., 230, 110 N. W., 951, 10 L. R. A. [N. S.], 74, 11 Ann. Cas., 150; *Hordern* v. *Salvation Army,* 199 N. Y., 233, 92 N. E., 626, 32 L. R. A. [N. S.], 62, 139 Am. St. Rep., 889; *Basabo* v. *Salvation Army,* 35 R. I., 22, 85 Atl., 120, 42 L. R. A. [N. S.], 1144, and others in accord) that champion the more restricted theory. There

are numerous cases which support the view we have adopted. Among these we may cite the following in which the rights of third parties were involved: *Fire Insurance Patrol* v. *Boyd,* 120 Pa., 624, 15 Atl., 553, 1 L. R. A., 417, 6 Am. St. Rep., 745; *Fordyce* v. *Woman's Christian National Library Association,* 79 Ark., 550, 96 S. W., 155, 7 L. R. A. (N. S.), 485; *Whittaker* v. *St. Luke's Hospital,* 137 Mo. App., 116, 117 S. W., 1189. Also the following where the parties suing were beneficiaries, but the exemption was placed on the broad ground substantially as we have stated: *Perry* v. *House of Refuge,* 63 Md., 20, 52 Am. Rep., 495; *Hearns* v. *Waterbury Hospital,* 66 Conn., 98, 33 Atl., 595, 31 L. R. A., 224; *Duncan* v. *Nebraska Sanitarium, etc. Ass'n,* 92 Neb., 162, 137 N. W., 1120, 41 L. R. A. (N. S.), 973, Ann. Cas., 1913E, 1127; *McDonald* v. *Massachusetts General Hospital,* 120 Mass., 432, 21 Am. Rep., 529; *Thornton* v. *Franklin Square House,* 200 Mass., 465, 86 N. E., 909, 22 L. R. A. (N. S.), 486; *Parks* v. *Northwestern University,* 218 Ill., 381, 75 N. E., 991, 2 L. R. A. (N. S.), 556, 4 Ann. Cas., 103; *Taylor* v. *Protestant Hospital Ass'n,* 85 Ohio St., 90, 96 N. E., 1089, 39 L. R. A. (N. S.), 427; *Adams* v. *University Hospital,* 122 Mo. App., 675, 99 S. W., 453; *Gable* v. *Sisters of St. Francis,* 227 Pa., 254, 75 Atl., 1087, 136 Am. St. Rep., 879; *Jensen* v. *Maine Eye & Ear Infirmary,* 107 Me. 408, 78 Atl., 898, 33 L. R. A. (N. S.), 141; *Lindler* v. *Columbia Hospital,* 98 S. C., 25, 27, 81 S. E., 512. And see *Vermillion* v. *Woman's College of Due West,* 104 S. C., 197, 88 S. E., 649. Of

138  Tenn.—40.

the foregoing cases, *Hearns* v. *Waterbury Hospital* limits the exemption to cases where there has been no negligence on the part of the corporation in the selection or retention of servants.   There are quite a number of other cases that support the general exemption with the same limitation.   Among these are *Lindler* v. *Columbia Hospital,* supra; *McDonald* v. *Massachusetts Hospital,* supra; *Thornton* v. *Franklin Square House,* supra; and *Farrigan* v. *Pevear,* 193 Mass., 147, 78 N. E., 855, 7 L. R. A. (N. S.), 481, 118 Am. St. Rep., 484, 8 Ann. Cas., 1109.   In the view we take of this case, however, it is not necessary that we should go over the authorities mentioned, or the many other authorities on the general subject, all of which we have examined.   A sufficiently clear view of the positions of the various courts, with citation of authorities, may be seen, collected in a summary manner, in 5 R. C. L., 374 to 379, sections 121 to 124;   11 Corpus Juris, pages 374 to 378,  sections 106 to 108.

However, we shall observe here that the doctrine designated as the trust fund doctrine, as applied to charities, in relation to the subject we now have in hand, seems to have had its origin in Feoffees of *Heriot's Hospital* v. *Ross,* 12 Clark & Finnelly, 507.   There an effort was made to hold the corporation liable for the wrong committed by the trustees in refusing to admit to the enjoyment of the charity one who fell within the class intended to be served by it.   To sanction such a demand on the trust estate it was said would be naught less than consent on the part of the court

to the diversion of a trust fund from the purposes to which it was devoted by the donor, and therefore the claim could not be entertained.   The principle would seem to be broad enough to cover all trusts, but it has not been so ruled.   In *Bennett* v. *Wyndham*, 4 De G., F. & J., 258, 262, it appeared that a trustee in the due execution of his trust directed the bailiff employed on the settled estate to have certain trees felled. The plaintiff ordered the woodcutters usually employed on the estate to fell the trees.   In doing so they permitted a bough to fall into a lane and on a passer-by, breaking his leg.   The injured man, Leany, brought suit to recover damages against the trustees, and recovered judgment for a sum equivalent to $6,000 'of our money.   The trustees paid the damages and applied in chancery for an allowance out of the estate.    The application was granted, the court, speaking through the Lord Justice KNIGHT BRUCE, said:

"The trustee in this case appears to have meant well, to have acted with due diligence, and to have employed a proper agent to do an act the directing of which was within the due discharge of his duty. The agent makes a mistake, the consequences of which subject the trustee to legal liability to a third party.   I am of opinion that this liability ought, as between the trustee and the estate, to be borne by the estate."

In case of charitable trusts the principle of immunity was at first applied as a general one, then subsequently limited in some jurisdictions as we have

stated. The underlying, though perhaps unexpressed thought suggesting these restrictions was that public policy would be best served thereby, it being judged by the court so holding more just, more in accord with sound policy, that the charity whose servants had caused the injury should bear the burden rather than third persons who had received no direct benefit from the institution. We say this was, as we think, the underlying reason or principle; the immediate reason, however, assigned in these cases was that direct beneficiaries of the charity, as for example, patients in charitable hospitals, students in schools and universities based on a charitable foundation, and the like, must be presumed to have agreed to the immunity or exemption, or to have waived liability for injuries inflicted by servants selected with ordinary care. Whether the broad view adopted in our State, and in the States with which we stand, or the more restricted view which obtains in some other jurisdictions, be based on the sounder conception of public policy is a matter of opinion. Reasons apparently strong have been suggested on each side of the controversy. It seem to us that institutions which so well and so extensively perform public service should in generous measure enjoy the immunity which pertains to those which are strictly public or governmental in their nature; not that the latter principle in terms applies to charities, but that by analogy it should in large measure apply; since charitable institutions, in the care of the sick, the succor of the

indigent, the education of the ignorant, and in other fields of activity, perform work which would otherwise devolve on the government, and deplete its revenues. We can only add that, with profound respect for the learned courts that have advanced the theory of implied agreement or waiver as the true ground of exemption, we are unable to regard that theory as furnishing a satisfactory basis. There are cases from time to time occurring, and not altogether infrequent, to which it is, as it seems to us, impossible to apply it—patients conveyed to hospitals in a demented condition, persons temporarily unconscious from injuries and who require immediate surgical and other attention, those who are so debilitated by disease as to have no power of understanding the terms of a contract, children too young to understand the meaning of a contract, or to make or be bound by one in any form, or even to understand the nature of the work to be done for them. How can such persons be held to waive a right of action which the law gives them? How can they be held to have agreed to an exemption? Manifestly the only sound theory is that of an exemption based on public policy. How this shall be applied to particular cases or classes of cases is a matter in the wise discretion of the courts of each jurisdiction, according to their conception of sound policy. We can see no objection to the application of public policy as a *ratio decidendi*. Every really new question that comes before the courts is, in the last analysis, determined on that theory, when

not determined by defferentiation of the principle of a prior case or line of cases, or by the aid of analogies furnished by such prior cases.    In balancing conflicting solutions, that one is perceived to tip the scales which the court believes will best promote the public welfare in its probable operation as a general rule or principle.    But public policy is not a thing inflexible.    No court is wise enough to forecast its influence in all possible contingencies.    Distinctions must be made from time to time as sound reason and a true sense of justice may dictate.

As stated, while we are disposed to adhere to the general doctrine already announced in the Abston Case, yet we are of the opinion that a distinction should be taken on the facts of the present case, arising out of the operation by the defendant corporation of the large office building described in the declaration.    This is averred to be "remote from and wholly separate and distinct from the university buildings and grounds, which are situated in the suburbs of the city," that this building consists of five stories, besides the basement, and contains numerous offices which are and have been for many years rented out annually to business and professional persons, firms, and corporations wholly disconnected from the university, or its educational work, in like manner in all respects as other office quarters are owned and rented out to tenants by other property owners of the city, and from whom are collected monthly rentals by the defendant in like manner in all respects as such ren-

tals are collected by other landlords from their tenants in the city; that defendant owns, maintains, and operates in this office building, and has done so for many years, an elevator for the use of its tenants therein, in like manner in all respects as elevators are owned, maintained, and operated by other owners in other office buildings in the city; that only a small part of the building is and has been at any time used by defendant for its law department, and for its law library for the use of its law students, and the larger portion of the building is and has been for many years rented out, as stated, to tenants as business offices, and the principle use to which the building is and has always been devoted is that of rented offices, and from which defendant derives a large annual income, the sum of between $5,000 and $10,000 and the rentals charged and collected are the full, usual, and customary rates charged for similar offices in the city.

Although this building was lawfully operated by the university as an investment for the purpose of making profits to be used in its educational work, as held in *Vanderbilt University* v. *Cheney,* 116 Tenn., 259, 94 S. W., 90, yet it was in our judgment an enterprise sufficiently distinct and remote from the central activities of the charitable organization to make it inadvisible, from the viewpoint of public policy, to extend the exemption from liability thereto. Nor indeed can we believe that the welfare of the charity would be advanced or promoted by such extension,

since there can be no doubt that, if it be determined that such acts of negligence as are averred in the declaration concerning the management and operation of the elevator in an office building are without redress in law, there would be few patrons of so dangerous an establishment. In our opinion as to such a remote enterprise the corporation should be held liable as any other corporation; but such damages as may be adjudged against it for breaches of duty in respect of such management should be charged as expenses of the operation of the particular property, and only the residue of the income should be available for the uses of the charity. This was in effect the holding in *Winnemore* v. *Philadelphia,* 18 Pa. Super. Ct., 625. In that case, as here, a separate building distinct from Girard College was operated for the purpose of making income to be used in the support of the charity. In that case as in the one before us the party suing was injured by the negligent operation of the elevator in the adjunct building named. In disposing of the matter the court said:

"Were the trustees of the Girard estate permitted to manage the real estate, as now improved, without liability on the part of the fund for the negligent acts of the servants necessary to the usefulness of the property, it would impose an unwarranted risk upon the public and upon the tenants. Such a condition would certainly result in injury to the trust itself, since tenants and frequenters would scarcely be attracted to a building with such extraordinary pro-

tection against liability for negligent employees, thrown around its ownership.''

To the same general effect, see *Holder* v. *Massachusetts Horticultural Society,* 211 Mass., 370, 97 N. E., 630.

We do not think the operation or validity of the exception we have stated is in any wise impaired by the fact that a small part of the building in question is used for the accommodation of the defendant's law department. That is but an incidental use. The main purpose of the building and its chief use is found in its service as an office building let for hire to the general public.

Furthermore, we do not mean to hold that any judgment that may be recovered can be levied upon or collected out of the university grounds or buildings, or any property therein or thereon located capable of use for the conduct of the charity. The declaration shows that there is ample property aside from the university grounds and buildings out of which may be realized any judgment likely to be recovered. It should be noted that in this class of cases the court will not permit judgment to be rendered when it is apparent there is no property out of which it can be collected. *Abston* v. *Waldon Academy,* supra. Even after judgment the court will restrain any effort to subject the property of the charity not liable to execution because of its exempt character. *Fordyce* v. *Woman's Christian National Library Ass'n.,* supra. It is to be observed also that in a

rather recent case where the court seemed to support the liability of the corporation as such without regard to any claim of exemption, this caution was added:

"Nor are we to be understood as holding the trust funds of the defendant may be applied to the payment of this verdict. The question is not involved. Defendant is not supported exclusively from such funds. On the contrary, its maintenance would seem from the evidence to come principally from patients who pay for services rendered them." *McInerny* v. *St. Luke's Hospital Ass'n.*, 122 Minn., 10, 141 N. W., 837, 46 L. R. A. (N. S.), 548.

In the case before us the facts stated with regard to the defective elevator and its negligent management resulting in the injury of plaintiff's intestate exhibit a clear cause of action.

We are of the opinion, therefore, that the court of civil appeals committed error in sustaining the demurrer filed by Vanderbilt University.

Now as to the case against the members of the executive committee.

Their demurrer is, in effect, that the declaration states no cause of action against them.

These defendants were not the trustees of the charity in whom the title was vested, therefore the under-servants through whom they discharged their duties were not their servants, but the servants of the corporation. Under the averments of the declaration the members of the committee were only intermediate

agents of the corporation, charged with the super-
vision, control, and operation of the building, includ-
ing, of course, the passenger elevator.   Under a fair
construction of the language of the declaration we
think it must be assumed that the details of opera-
tion, as, for example, the running of the elevator,
were properly devolved upon subordinate servants
selected by them, under the oversight and control of
the executive committee, and also that they held under
their control and supervision the fitness and efficien-
cy of the elevator for the use for which it was de-
signed.   The substance of the averment is that,
knowing the elevator was in a defective and unsafe
condition, they, having power to forbid its use, per-
mitted it to be used by the elevator boy on the occa-
sion in question, and that by reason of the defect the
elevator fell and caused the injury which resulted in
the death of plaintiff's intestate.   We attach no im-
portance to the averment concerning the incompeten-
cy of the elevator boy, because it is not further
averred that the committee had any knowledge or no-
tice of such fact, or that they failed to exercise due
care in his selection.   Even after the exercise of due
care, that is, ordinary care, the defendants in ques-
tion might have failed to discover the want of com-
petency on the part of the elevator boy.   So, the case
must turn on the defective condition of the elevator
and the use of it in that condition with the knowledge
and assent of the committee in charge, and, in effect,
under their continuing order, with the resulting in-
jury.

Does this make a case of liability to a third party, or were the members of the committee on these facts liable only to their principal, the corporation? We think it makes a case of liability to the third party. It was not merely an act of nonfeasance for which there was responsibility of the intermediate servant to the master only, as for example the failure to have the elevator repaired, but a case of actual misconduct, suffering the elevator under their control to be operated that day when they knew it was unsafe and unfit for operation, thereby knowingly subjecting third parties to a great hazard. It was a case not of nonfeasance, but of misfeasance. Having this dangerous agency under their control, they owed to third parties the duty of operating it in such a manner as not to injure them. According to the averment, they knowingly set in motion a dangerous agency which they knew, owing to its defects, would probably injure any passenger riding on it. Under such circumstances they became active participants in the wrong inflicted, and cannot escape liability on the ground of their representative character. They could not be held responsible for any improper management of the machine by the elevator boy, or for negligence on his part (to this the corporations itself would have to respond), but they are responsible for their own act in subjecting third parties, knowingly, to the danger stated. Having supervision, control, and operation of the building and its machinery, the use of the ele-

vator must, as already intimated, be regarded as under their continuing order or command.

For nonfeasance an agent is responsible to his principal only. For misfeasance he may be responsible to third parties also. Nonfeasance is doing nothing. Misfeasance "is a failure to use in the performance of a duty owing to the individual, that degree of care, skill, and diligence which the circumstances . . . reasonably demand." *State* v. *McClellan,* 113 Tenn., 616, 621, 85 S. W., 267, 3 Ann. Cas., 992. "It is often said in the books," writes the Supreme Judicial Court of Massachusetts, "that an agent is responsible to third persons for misfeasance only, and not for nonfeasance. And it is doubtless true that if an agent never does anything towards carrying out his contract with his principal, but wholly omits and neglects to do so, the principal is the only person who can maintain any action against him for the nonfeasance. But if the agent once actually undertakes and enters upon the execution of a particular work, it is his duty to use reasonable care in the manner of executing it, so as not to cause any injury to third persons which may be the natural consequence of his acts; and he cannot, by abandoning its execution midway and leaving things in a dangerous condition, exempt himself from liability to any person who suffers injury by reason of his having so left them without proper safeguards. This is not nonfeasance, or doing nothing, but it is misfeasance, doing improperly." *Osborne* v. *Morgan,* 130

Mass., 103, 39 Am. Rep., 437. One or two illustrations from the decided cases will suffice. In *Hagerty v. Ore Co.,* 38 Mont., 69, 98 Pac., 643, 25 L. R. A. (N. S.), 356, it appeared that the defendant, superintendent of a mine, permitted a cage to be operated in a defective shaft, known by him to be defective, by means of which a third person, unacquainted with the danger, in descending was injured. He sued Wilson, and was met by the defense that the immediate cause of the accident was the negligence of the servant operating the cage, and that he was the servant not of Wilson but of the mining company. The court held that Wilson was guilty of misfeasance in permitting the cage to be operated in view of the dangerous condition of the shaft, which contributed to the injury. In *Consolidated Gas Co., of Baltimore City* v. *Connor,* 114 Md., 140, 78 Atl., 725, 32 L. R. A. (N. S.), 809, it appeared that a gas company was acting as agent of the city to keep its service pipes in repair from its mains to the city lamps. By reason of its failure to comply with this duty the gas when turned in escaped and injured a third party. It was held that this was misfeasance for which the gas company was responsible to the third party. See, also, *Mayor* v. *Thompson-Hutchinson Building Co.,* 104 Ala., 611, 16 So., 620, 28 L. R. A., 433 and notes, 53 Am. St. Rep., 88, and note to *Wines* v. *Crosby,* Ann. Cas., 1913D, 1055. In *Tippecanoe L. & T. Co.,* v. *Jester,* 180 Ind., 357, 101 N. E., 915 L. R. A., 1915E, 721, it was held that an agent in full control

and management of an apartment house for the owners was personally liable to one having a right to use the passenger elevator for injury to him from the negligence of the agent in respect to it.

There is nothing in the foregoing in the least out of harmony with our cases *Nunnelly* v. *Iron Co.,* 94 Tenn., 397, 29 S. W., 361, 28 L. R. A., 421, *Drake* v. *Hagan,* 108 Tenn., 265, 67 S. W., 476, or *Lumber Co.* v. *Sessler,* 128 Tenn., 665, 163 S. W., 812, Ann. Cas., 1915C, 103. The second of these was a case in which at most the agent was guilty of a mere nonfeasance. In *Lumber Co.* v. *Sessler,* the manager or intermediate agent was guilty of no wrongdoing at all, but was sought to be held liable for the negligence of a subordinate servant. The court correctly held that the ultimate master was the responsible party, not a mere intermediate servant. In *Nunnelly* v. *Iron Co.,* it was held that the officers of a corporation participating in its wrongdoing were guilty with it to a third party for an injury inflicted.

It results that on this branch of the case the court of civil appeals is affirmed.

An order will therefore be entered reversing the court of civil appeals on the first branch of the case, affirming it on the second branch, and remanding the cause to the circuit court of Davidson county for further proceedings.

The defendants will pay the costs of the appeal.