IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION.

---

## NASHVILLE. DECEMBER TERM, 1921.

---

LOVE *v.* NASHVILLE AGRICULTURAL AND NORMAL INSTITUTE
*et al.*

(*Nashville.* December Term, 1921.)

1. **WATERS AND WATER COURSES.** Evidence justified finding of contamination of spring by sewage.

In suit to enjoin defendants from maintaining a nuisance in the operation of a school and sanitarium by means of conducting sewage from its plant in such a way as to contaminate water in plaintiff's spring located on adjacent premises, evidence *held* to justify finding of contamination. (*Post, pp.* 554-562.)

Code cited and construed: Sec. 2513, subsecs. 1, 2, 4 (S.).

2. **WATERS AND WATER COURSES.** Party rendering spring of another impure creates nuisance.

If a person render the spring of another impure by filth, offal, etc., to his injury, he thereby creates a nuisance, which can be abated as such. (*Post, pp.* 562-570.)

550

Love v. Nashville Agrl. & Normal Institute.

Cases cited and approved: Franklin v. Armfield, 32 Tenn., 305; Hall-Moody Institute v. Copass, 108 Tenn., 582; Roosen v. Peter Bent Brigham Hospital, 235 Mass., 66; Vermillion v. Woman's College of Due West. 104 S. C., 197.

Cases cited and distinguished: Abston v. Waldon Academy, 118 Tenn., 24; Gamble v. Vanderbilt University, 138 Tenn., 616; Bennett v. Wyndham, 4 De G., F. & J., 258, 262.

3. **CHARITIES.** Educational institution liable in damages for maintaining nuisance.

In view of Shannon's Code, sections 6750, 6751, defining certain nuisances and providing for their abatement, although as a general rule the trust funds of a charitable educational corporation organized under Shannon's Code, section 2513, subsecs. 1, 2, 4, cannot be diverted by means of a judgment on account of negligence of its employees and servants, nevertheless it may not enjoy immunity from damages where those damages result from the maintenance and operation of a nuisance. (*Post, pp.* 570-572.)

Cases cited and approved: Kolb v. Knoxville, 111 Tenn., 314; Pierce v. Gibson .County, 107 Tenn., 233; Pierce v. Gibson County, 107 Tenn., 224; Chattanooga v. Dowling, 101 Tenn., 345; Atlanta v. Warnock, 23 L. R. A., 301; Nashville v. Mason, 137 Tenn., 169; Kolb v. Knoxville, 111 Tenn., 314; Knoxville v. Klasing, 111 Tenn.. 134; Chandler v. Davidson County, 142 Tenn., 265.

Code cited and construed: Secs. 6750, 6751 (S.).

4. **CORPORATIONS.** Corporations are criminally liable, and may be prosecuted independently of fact that act was performed by means of agents.

Corporations are even criminally liable, and may be prosecuted independently of the fact that the criminal act was performed by means of agents, and is indictable for committing a public nuisance whether the committing of the act involves nonfeasance or misfeasance. A*Post, pp.* 573-577.)

Cases cited and approved: Louisville, etc., Railroad Co. v. State, 40 Tenn., 523; Turnpike Co. v. State, 96 Tenn., 249; Drake v. Hagan,

Love v. Nashville Agrl. & Normal Institute.

108 Tenn., 265; Erwin v. Davenport, 56 Tenn., 44; Elmore v. Brooks, 53 Tenn., 45; Deaderick v. Bank, 100 Tenn., 457; Caulkins, v. Gas Light Co., 85 Tenn., 683; Roosen v. Peter Bent Brigham Hospital, 235 Mass., 66; Vermillion v. Woman's College of Due West, 104 S. C., 197.

5. MASTER AND SERVANT. Principal liable to third person for agent's negligence.

The rule of nonliability for the negligence of an agent or servant on account of nonfeasance is limited to the breaches of duty owed by the agent to his principal, and has no application where there is a breach of duty owing by the agent himself to third persons. (*Post, pp.* 577, 578.)

Case cited and approved: Gamble v. Vanderbilt University, 138 Tenn., 616.

6. WATERS AND WATER COURSES. Elements of damages for contaminating spring stated.

In an action for contamination of a spring by sewage, damages to the reputation of the spring as pure and medicinal water, the value of the property, and the proceeds of the spring were proper elements to be considered. (*Post, p.* 578.)

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—HON. JOHN T. LELLYETT, Chancellor.

JOHN B. DANIEL, for plaintiff.

W. P. COOPER and E. J. SMITH, for defendants.

Mr. Special Justice L. D. Smith delivered the opinion of the Court.

The purpose of the original bill in this case was to enjoin the defendants from maintaining a nuisance in the operation of its school and sanitarium by means of conducting sewage from its said plant in such a way as to contaminate the water in a well or spring of complainant located upon his premises adjoining those of the defendant, and to recover damages occasioned thereby previous to the filing of the bill; it being alleged that the water has a commercial value, possessing medicinal qualities.

The answer of the defendants put in issue the averments of fact upon which the relief was sought, and set up other defenses, some of which are not relied upon in this court. Other defenses in the answer urged here are that, even though the drainage of this sewage might contaminate complainant's water, defendant institute was not liable in damages, because it was a religious, charitable, and educational corporation, whose property and funds were being used in a trust capacity, and therefore were not liable for damages resulting from negligence, and that the other defendants, the trustees and managers of the institution, were not liable, because they were not guilty of any misfeasance in the operation thereof.

On the hearing of the cause before the chancellor he was of the opinion that the preponderance of the proof showed that the sewage from this institution entered from the drain where it was deposited an underground channel, and by that means reached the complainant's well and contaminated his water, and that this situation constituted a nuisance which the complainant was entitled to have

abated and permanently enjoined. The chancellor also decreed that the complainant had been damaged, "both in the character of his spring, the reputation of his spring as a pure and medicinal water, and also in the value of his property and in the proceeds of his spring, which he was engaged in putting upon the market at the time that this contamination became a fact." The chancellor did not decree to what extent the damage to complainant was the result of pollution of the water, nor did he undertake to fix the amount of damages sustained, but referred the case to the master to hear proof and report. From this decree an appeal was allowed and taken to the court of civil appeals.

The court of civil appeals concurred with the Chancellor, both in his conclusions as to the facts and upon the questions of law presented, and the decree was in all things affirmed by that court. Thereupon the complainant filed a petition in this court for *certiorari* in order to have a reversal of the decree of that court. The writ has been allowed, and the case is before us for final determination upon the errors assigned by the defendants to the decree of the court of civil appeals.

While it is conceded by the defendants that as the case now stands it has been established as a fact that this sewage of the defendants reaches the complainant's spring in some unknown manner, and that this court is bound by the concurrent findings of fact of the chancellor and court of civil appeals, the action of the court of civil appeals is assigned as error, because the proof on which the finding is based is incredible, impossible, and unreasonable.

It is conceded that the sewage from the defendants' institution is conducted from the immediate premises by

means of pipes to a natural drainage which leads into the
Cumberland river. There is evidence to the effect that this
drain runs along by the side of a bluff, and that below the
point where it is emptied from the pipes into the drain
there is a hole of considerable size in the rock, into which
during dry weather, there being little or no water flowing
in the drain, the sewage enters, and at the time of the filing
of the bill the defendants were emptying something like
five thousand gallons of sewage into this drain. This
opening into the bluff is something like thirty-two feet
above the bottom of the complainant's well, and between
twenty-two and thirty-two feet above the point where the
stream which supplies the complainant's well enters the
well. This opening in the drain is shown to run in the
direction of the complainant's well, and it is also shown
that in the well there is an opening which comes from the
direction of the defendants' property. Some time in the
year 1919 the complainant, being desirous of having an
analysis made of his water for the purpose of determining
its mineral qualities, submitted samples from the well to
Dr. W. H. Hollinshead, an expert chemist in charge of
chemistry at Ward Bellmont and for many years con-
nected with Vanderbilt University as professor of Chem-
istry, and a graduate of Vanderbilt in the pharmaceutical
and academic departments, and who had had over thirty
years' experience in all branches of analytical chemistry,
during which time he had analyzed the source of many
water supplies. In making this analysis the chemist dis-
covered that the water was contaminated, being polluted
by sewage from some source. The complainant, being ad-
vised of the result of this analysis by the chemist, set
about to ascertain the source of the contamination. He

discovered that the sewage from the defendants' institution was being delivered by pipes into this drain.    This sewage of course gave off offensive odors, containing as it did the offal naturally accumulating from an institution of this character.    The sewage emptied into a hole in the rocks at a level considerably above that of his spring. In order to determine whether this sewage by any means entered into his well by means of an underground channel, numerous tests were made, not only by the complainant himself, but by this chemist and under his directions. One test made by the complainant was by pouring a large quantity of water colored with indigo into the opening in the drain, and subsequently finding blue water in his well. A practical test used by the chemist to trace the course of the water was by using potassium iodide.  That is used because the iodide is easily detected.    Before using the iodide test, in view of the fact that he had found iodine in the water in small amounts when analyzing it for the mineral qualities, he made an analysis of the water from the spring for the purpose of ascertaining whether at that time it contained any iodine, and, after making a thorough test and finding that it contained none whatever, he placed into the sewage from the defendants' institution some three pints of potassium iodide, and thereafter took samples from the water of the spring over a period of six hours. The first three samples showed no trace of iodine, but later samples showed its presence.    Collections of samples were continued until the iodine disappeared. From this test the chemist concluded that the opening in the drain connected directly with the complainant's spring.    In order to make assurance doubly sure the chemist thereafter used aniline and put it into the opening, and  a  subsequent

thorough test developed the presence of the aniline in the complainant's spring. Another evidence was the fact that the solution found by the chemical analysis was of that character of material found in the source, and so far as known there was no other source for material of this character to enter the spring.

There is certainly no basis for the charge that this testimony is unreasonable or improbable, when taken alone. Its unreasonableness and the improbability or impossibility of its being true is based upon evidence which the defendants introduced. It is shown that the drain into which this sewage is deposited empties into the Cumberland river at a point below the complainant's spring, and between the complainant's spring and the drain are high ridges, which indicates that the drain of the surface water at least is in the direction from the complainant's property to that of the defendants. But this is no obstacle to the conclusion reached by the chancellor and the court of civil appeals, since it is a well-known fact that there are underground channels, and the improbability is dispelled when it is remembered that there is in fact an opening in this drain at a level considerably above that of the spring. Again, it is said that Dr. Litterer made several tests of this water in 1918 without discovering any contamination or pollution whatever. This evidence, while a circumstance, is not conclusive, for the reason that at the time these tests were made there may have been no connection between the sewage system of the defendants and the complainant's spring. Another fact relied upon by defendants as establishing the unreasonableness of the plaintiff's proof on this point is that the United States government, through one of its sanitary officials, undertook a test which,

had there been any connection between the defendants'
sewage and the complainant's spring, would have devel-
oped the fact.  There is evidence to show that the govern-
ment official conducted his experiments in such a way as
would not determine the fact; that is to say, he made his
examination below the point of the opening.in the bluff,
and by the use of a comparatively small amount of color-
ing matter, and at a time when there was high water and
backwater, that would interfere with his test.    There is
also evidence that the river would overflow the complain-
ant's spring, and evidence of unsanitary conditions sur-
rounding it.   None of this contravening testimony can be
said to be so convincing as to render the evidence in com-
plainant's favor unbelievable.   The most that could be said
in favor of this contention of defendants is that, taken as
a whole, the evidence in their favor preponderates against
that of the complainant.  A careful examination of this
testimony leads us to the same conclusion as that reached
by the chancellor and the court of civil appeals, to the
effect that this sewage from the defendants' institution
entered a cavity in the drain which passed through this
und ground channel to the complainant's spring.   That
the complainant's water was contaminated from some
source is not seriously disputed— certainly abundantly es-
tablished.   Under this evidence we would not be warranted,
certainly under the rule adopted, in overruling the con-
clusions of fact in which the chancellor and court of civil
appeals have concurred.   The assignment of error there-
fore on this phase of the case must be overruled.

The action of the court of civil appeals is assigned as
error, because it is said that the proof shows that the filthy
condition of the premises of the complainant, and other

natural causes, including overflow or backwater from the Cumberland river, contributed to the contamination present in the spring of the complainant. This was one of the disputed facts, and there is an abundance of evidence to sustain the conclusion of fact to be against this assignment. But if it be conceded that some portion of the con tamination was occasioned by the sources referred to in this assignment, nevertheless it would not defeat the complainant's right to enjoin the defendants permanently from maintaining this nuisance and from depositing this contaminating matter into the complainant's spring. The chancellor did not undertake to adjudicate to what extent, if any, the contamination of complainant's water was due to the conditions named in this assignment. It may be inferred from the chancellor's opinion that the complainant was entitled to recover as damages to the extent and in the proportion to which defendants had contributed to the pollution of his water, if any, although the complainant's own neglect and the acts of others may have contributed thereto also. If the water was contaminated by the conduct of the complainant himself, or from other sources with which the defendants were disconnected, the water could not have been used, and all the damages would have resulted just the same as if the defendants had had no part in the contamination of the water, so that in such event no damages would be recoverable. But as these other sources of contamination could be dealt with by the complainant, the defendant cannot be justified in continuing the operation of this nuisance. The complainant can remedy such conditions as result from his own conduct, and may take means to prevent contamination from other sources, and therefore is entitled to prevent any con-

tamination of his water by these defendants, and to enjoin them from continuing the operation of a nuisance.

The correctness of the decree of the court of civil appeals, in so far as the defendant corporation is concerned, is challenged upon the ground that it is an eleemosynary or charitable institution, whose funds are held in trust, which would be dissipated and diverted from the purposes for which they were donated, and that therefore it cannot be subjected to a judgment for damages occasioned by the means established by the findings of fact.

The defendant Nashville Agricultural & Normal Institute was chartered under the general welfare form by the State of Tennessee, and was organized for the purpose of founding an agricultural and normal school and a sanitarium at Madison, Tenn., and, if desired, at other points in the State of Tennessee, and elsewhere in the United States of America, for the teaching and training of missionaries, teachers, and farmers, who are willing to devote at least a certain portion of their lives in unselfish unremunerative, missionary labor for the glory of God and the benefit of their fellowmen. The charter provides that the institution so to be established shall be undemoninational and unsectarian, in so far as that any worthy and approved person or persons may be accepted as students, but it shall be sectarian and denominational to the extent that the religious doctrines taught and inculcated shall be those of the Seventh-Day Adventist Church. The charter, in describing the purposes of the corporation, copies those stated under subsections 1, 2, and 4, section 2513, of Shannon's Code, as follows:

"(1) *Religion.*—The support of public worship, the building of churches and chapels, and the maintenance of all missionary undertakings.

(2) *Charity.*—The support of any benevolent or charitable undertaking—as, a lodge of Masons, Odd Fellows, hospitals for the sick, . . . orphan asylums, and all other objects of like nature. . . .

(4) *Literature, history, painting, music, fine arts, trade.* —The support of any literary or scientific undertaking— as a college or university, with powers to confer degrees, an academy, a debating society, lyceum—the establishment of a library; the support of a historical society; the organization and support of battle field associations; the promotion of painting, music, or the fine arts; the support of boards of trade or chambers of commerce, or other objects of like nature."

It appears from the evidence that there is conducted by the defendant upon its property adjoining that of complainant a sanitarium and school. In this sanitarium the sick are treated along the lines of what is known as the Battle Creek Institution under the medical teachings of Dr. Kellogg. There is conducted a normal school for the training of teachers. All the funds of this institution which it has and which have been invested in its property were donated by friends of this kind of educational work. While some funds are derived from patients admitted to the sanitarium, and other sources, they are all devoted to the institution itself for the payment of expenses of operation and employment of teachers and equipment. No dividends or profits are derived from the operation of the institution. It has been exempted from taxation by the State and county officials. It has no funds provided from which it can pay damages, and any judgment that might be rendered against it would have to be derived by proc-

esses of law against its property, or secured by other donations.

Whatever damages have resulted to the complainant have resulted from the maintenance of a nuisance. It is well-settled law that if a person render the water of another impure by filth, offal, or other substance, to his injuries, he thereby creates a nuisance, under our statute as well as the common law, which can be abated as such.

The evidence shows that the defendant Nashville Agricultural & Normal Institute is a charitable and eleemosynary institution, and such as is entitled to exemption for damages under what is known as the trust fund doctrine, if that doctrine may be applied to damages arising from the maintenance of a nuisance which resulted in injury to the complainant's property by reason of depositing the sewage incident to the operation of the institution.

This court is committed to the so-called trust fund doctrine urged by defendant against the decree with respect to damages for personal injuries sustained by a pupil of an institution of this character. *Abston* v. *Waldon Academy,* 118 Tenn., 24, 102 S. W., 352 (11 L. R. A. [N. S.], 1179). In that case the plaintiff, who was a pupil of the institution occupied a room in a three-story building erected by the corporation to furnish sleeping apartments for the young girls in attendance upon the school. The building took fire, and in an attempt to escape from the flames the plaintiff leaped from a window and was seriously injured. The action was grounded on an ordinance of the city of Nashville and an act of the legislature which required the erection of suitable and sufficient fire escapes on a building of the character of the one in question, and that by reason of the failure of the corporation to erect

fire escapes it was impossible for the plaintiff to escape save as she did.

The defendant in that case was an eleemosynary corporation; issued no stock and paid no dividends; its foundations were laid in charitable donations, and it had been operated and conducted from bequests, and its grounds, buildings, and funds had come from such bequests, and were, by the expressed will of the donors, to be held in trust for public charity. These facts appearing in the declaration, it was demurred to, and the demurrer presented the question as stated by the court:

"Can such an action be maintained where, if so, the property placed by benevolent parties under the control of this corporation for what is well settled in this State to be a charitable use (*Franklin* v. *Armfield,* 2 Sneed, 305) must be appropriated to its satisfaction?"

The court sustained the demurrer, and held that the funds of this corporation could not be subjected by a judgment to satisfy damages sustained by a beneficiary of the institution on account of the failure of the managers of the institution to comply with the safeguards required by the ordinances of the city and by the legislature of the State for the protection of persons occupying its buildings against fire. In that case the decision might well have been placed upon the ground that a beneficiary of the charity, in consideration of the privileges enjoyed, will be presumed to have waived any right to damages, and therefore not be allowed to draw upon funds set apart solely for charitable and educational purposes. The reasoning was not so limited, but the general reason was given that to permit the payment of such damages would result in a diversion of the trust fund from the purposes to which it

was donated by the donor, and would in many cases result in the destruction of the charity, with a consequent discouragement of donors, to the detriment of the public welfare.

The trust fund doctrine as applied in the Waldon Academy Case, carried to its logical conclusion, would permit of no exceptions and operate to exempt institutions of this character from damages of all sorts, which might result from mismanagement of the officers of the corporation or the torts of any of its agents or employees, regardless of how they may have been inflicted or the persons affected thereby. But the doctrine itself is a child of public policy, and in the very nature of things must sometimes run counter to other matters of public policy of equal or greater importance. Indeed strong reasons may be offered, and have been by courts of eminence, against the soundness of the doctrine itself. The writer of this opinion believes the premise from which the logic proceeds is faulty. All persons who undertake to do charity, whether directly or by means of corporations, agents, or trustees, must necessarily know that all human agencies are liable to err, and in the administration of such a trust expect mismanagement and acts of negligence upon the part of those to whom the work is intrusted. Therefore necessarily there attaches to such a trust a condition that the funds shall be used to defray any and all liability that may occur as a result of the administration of the trust. It is fundamental that an individual in doing a charitable act is responsible for his conduct which inflicts injury upon others, notwithstanding the benevolent purpose of his act. That being so, there would seem to be no reason at all for exempting him from liability where he sets apart a fund and

places it in the hands of trustees to administer, and thereby render himself immune from liability for injuries resulting therefrom; nor any authority which would permit a person to attach to a charitable trust a condition that the funds should not be used to compensate for injuries resulting from the necessary fulfillment of its purposes. Whatever may be said for or against the soundness of the doctrine as an original proposition, we are not prepared to repudiate it, and do not do so, but there are cogent reasons for limiting its operations, and the real question here is whether or not a limitation to its application should be made in the case now before the court.

The doctrine invoked here by the defendant was first considered by this court in the case of *Hall-Moody Institute* v. *Copass*, 108 Tenn., 582, 69 S. W., 327. That was an action for damages arising out of the discharge of the plaintiff as a teacher in the Hall-Moody Institute. It was argued that the defendant was an eleemosynary institution, and hence not liable to judgment. While the trust fund doctrine was not discussed in that case, it is evident that it was the foundation of the argument made against the judgment. The contention was denied upon the ground that the action was not one of tort, but for a breach of contract whereby the trustees agreed for the institution to pay the plaintiff a stipulated salary for her services as a teacher. It was said in the opinion of the court, "The contention might and probably would be correct if this were a suit for a tort committed by the trustees," but, the case being one for breach of contract, the contention was held to be unsound. The breach of a contract is in the nature of a tort, in that it may involve damages in an amount in excess of what the institution would have paid

under the contract, and by the breach might subject the funds of the institution to purposes not contemplated, and which would not have followed if there had been no mismanagement or wrong committed by those intrusted with the execution of the trust. From this case we are justified in concluding that the court has not lent itself to the unlimited application of this doctrine.

That there are limitations to its universal application was settled by this court in *Gamble* v. *Vanderbilt University*, 138 Tenn., 616, 200 S. W., 510, L. R. A., 1918C, 875. In that case the plaintiff was injured by the negligent operation of an elevator, which the university had in use in connection with a building which it rented to business and professional men for uses wholly disconnected with the educational work of the university, but the proceeds of which were devoted to the general purposes of that institution. Of course if the trust fund doctrine had been deemed unrestricted in its application Vanderbilt University would have been entitled to immunity and exemption from liability for the damages which resulted from negligence of one of its employees working for the promotion of the ultimate purposes of the university. But it was held by the court that that doctrine did not apply in a case of that kind. It was said:

"In case of charitable trusts the principle of immunity was at first applied as a general one, then subsequently limited to some jurisdictions as we have stated."

One of the cases in which it was limited, referred to by the court, was that of *Bennett* v. *Wyndham*, 4 De G., F. & J., 258, 262, in which it appeared that a trustee in the execution of his trust directed the bailiff employed on the settled estate to have certain trees felled. This work was

done by those usually employed on the estate to do that kind of work, and in performing the work they permitted a bough to fall into a lane on a passer-by and injure him. The injured man brought suit, and recovered a judgment against the trustee. The trustee paid the damages, and applied in chancery for an allowance out of the estate. In allowing the application Lord Justice Knight BRUCE said:

"The trustee in this case appears to have meant well, to have acted with due diligence, and to have employed a proper agent to do an act the directing of which was within the due discharge of his duty. The agent makes a mistake, the consequences of which subject the trustee to legal liability to a third party. I am of opinion that this liability ought, as between the trustee and the estate, to be borne by the estate."

A study of the Vanderbilt Case shows that the application of this trust fund doctrine is limited by reasons of public policy. The court in that case, in discussing the reasons advanced by the courts which hold to the restricted view of this doctrine, said:

"Manifestly the only sound theory is that of an exemption based on public policy. How this shall be applied to particular cases or classes of cases is a matter in the wise discretion of the courts of each jurisdiction, according to their conception of sound policy. We can see no objection to the application of public policy as a *ratio decidendi*. Every really new question that comes before the courts is, in the last analysis, determined on that theory, when not determined by differentiation of the principle of a prior case or line of cases, or by the aid of analogies furnished by such prior cases. In balancing conflicting solutions, that

one is perceived to tip the scales which the court believes
will best promote the public welfare in its probable op-
eration as a general rule or principle.   But public policy
is not a thing inflexible.   No court is wise enough to fore-
cast its influence in all possible contingencies.   Distinc-
tions must be made from time to time as sound reason and
a true sense of justice may dictate."

So it was held:

"While we are disposed to adhere to the general doc-
trine already announced in the Abston Case, yet we are
of the opinion that a distinction should be taken on the
facts of the present case, arising out of the operation by
the defendant corporation of the large office building de-
scribed in the declaration."

This distinction will generally obtain in cases of in-
juries to entire strangers to the trust.

A distinction was made upon the theory that, although
the building was operated for the purpose of making
profits to be used in its educational work, yet "it was in
our judgment an enterprise sufficiently distinct and re-
mote from the central activities of the charitable organiza-
tion to make it inadvisable, from the viewpoint of public
policy, to extend the exemption from liability thereto."
Another reason suggested was that the welfare of the
charity itself would not be advanced nor promoted by such
extension, since "if it be determined that such acts of neg-
ligence as are averred in the declaration concerning the
management and operation of the elevator in an office
building are without redress in law, there would be few
patrons of so dangerous an establishment."

Nearly all of the cases in which the trust fund doctrine
has been applied in other jurisdictions, and all of them in

this State, were cases in which the damages resulted to beneficiaries of the fund, some of the cases placing the decision upon the ground of waiver, others of public policy, others upon the performance of public functions, others that the doctrine of *respondeat superior* did not apply. The great weight of authority is that the doctrine is not applicable in the case of liability to a stranger. A recent case applying the rule to strangers without reference to whether the damages resulted from the negligence of some servant or in the selection of servants is the case of *Roosen* v. *Peter Bent Brigham Hospital,* 235 Mass., 66, 126 N. E., 392, 14 A. L. R., 563. Also *Vermillion* v. *Woman's College of Due West,* 104 S. C., 197, 88 S. E., 649.

From a consideration of our own and other cases, and reflection upon the principles that ought to obtain, we are of the opinion that the trust fund doctrine is not applicable to the case presented in this record. There are two fundamental considerations supporting this conclusion. In the first place, public policy does not warrant us in affording immunities to a charitable corporation that do not exist in favor of municipal corporations in the administration of public services which are strictly public or governmental in their nature. This is implied from another observation made in the Vanderbilt University Case, to-wit:

"Reasons apparently strong have been suggested on each side of the controversy. It seems to us that institutions which so well and so extensively perform public service should in generous measure enjoy the immunity which pertains to those which are strictly public or governmental in their nature; not that the latter principle in terms applies to charities, but that by analogy it should in large measure

apply; since charitable institutions, in the care of the sick, the succor of the indigent, the education of the ignorant, and in other fields of activity, perform work which would otherwise devolve on the government, and deplete its revenues."

The damages occasioned by the defendant institution in this case resulted from the operation and maintenance by the defendant of a nuisance. It is made such by statute. Sections 6750 and 6751, Shannon's Annotated Code. This is true also at common law. *Kolb* v. *Knoxville,* 111 Tenn., 314, 76 S. W., 823; *Pierce* v. *Gibson County,* 107 Tenn., 233, 64 S. W., 33, 55 L. R. A., 477, 89 Am. St. Rep., 946.

That the complainant is entitled to have this nuisance abated, and to that end have the injunction granted by the chancellor made perpetual, cannot be and is not seriously contested. No principle involved in the trust fund doctrine can justify the continued maintenance by a charitable corporation of a nuisance working injury to another's property. Even the arm of the government, such as a county, in the exercise of public and governmental functions, is not entitled to erect or maintain a nuisance, and is subject to restraint by injunction. It was so held by this court in *Pierce* v. *Gibson County,* 107 Tenn., 224, 64 S. W., 33, 55 L. R. A.; 477, 89 Am. St. Rep., 946. In that case Gibson county had in course of construction a courthouse building, in which provision was made for water-closets and urinals to be connected with the sewer pipe, which the commissioners were proceeding to lay down; the avowed intention being to attach the courthouse closets, as well as the closets of the county jail, to be conveyed through the sewer pipe and a dry ditch to empty upon the lands of the complainant. Bill was filed to enjoin this proposed action of the county commissioners. It was contended

for the commissioners that the construction of the sewer was the exercise by the county of a governmental power which could not be controlled by the courts, but it was held that—

While the necessity for a sewer and its location and general plan are matters which involve the exercise of discretion and which the courts will not ordinarily interfere with, "but," said the court, "it is well settled that a municipality or county, in the construction of a public work, is not privileged to commit a nuisance, to the special injury of the citizens, and for such act is liable as a private individual in damages, or it may be restrained by the writ of injunction. *Chattanooga* v. *Dowling,* 17 Pick., 345, and authorities there cited; *Atlanta* v. *Warnock,* 23 L. R. A., 301, and note.

"In the last case it was held that the municipal government of Atlanta, though invested by statute with plenary power on the subject of streets, sewers, etc., has no right to create and permanently maintain a nuisance dangerous to health and life, which nuisance consists of 'manholes' in a sewer located in a public street contiguous to the dwelling of a citizen, the manholes being allowed to emit poisonous gases in large quantities through perforated covers placed over them."

It is difficult to appreciate a distinction which subjects a corporation to restraint by injunction for the abatement of a nuisance and at the same time permits it to escape payment for damages occasioned by the maintenance of such a nuisance. It is established by our own cases that counties and municipalities and governing bodies in the prosecution of governmental functions are liable in damages resulting from the operation and maintenance of nui-

sances.   In *Nashville* v. *Mason,* 137 Tenn., 169, 192 S. W., 915, the court held that the city was not liable for the destruction of a house by fire communicated by the burning of the city's garbage, upon the theory that the duty to extinguish fires was a public one for which the city was not liable, and not liable for the negligence of its servants, "but this statement must be qualified by the previous announcements of this court in the cases of *Kolb* v. *Knoxville* [111 Tenn., 314] and *Knoxville* v. *Klasing* [111 Tenn., 134], to the effect that, although in the discharge of a governmental duty, it must not commit a nuisance."

In *Chandler* v. *Davidson County,* 142 Tenn., 265, 218 S. W., 222, it was held that a county, although not liable for misfeasance of its agents, is not authorized to commit nuisance, either public or private.   It was said that while a county is not liable for negligence of agents in the discharge of their public duties because there is no statute making it liable, and none exists at common law, because of the limited nature of the corporate character of the county, nevertheless the county was held liable where in constructing and repairing a road its commissioners and superintendents created a nuisance as a result of which a pedestrian was injured.   Any number of cases might be cited in support of the proposition that while an arm of the government exercising governmental functions cannot be held liable for the negligence of its agents, nevertheless it cannot create and maintan a nuisance, and is liable for damages incident thereto.   If the creator, the government, is not immune, why should one of its creatures be?

Corporations are even criminally liable, and may be prosecuted independently of the fact that the criminal act was performed by means of agents. *Louisville, etc., Railroad Co.* v. *State,* 3 Head, 523, 75 Am. Dec., 778; *Turnpike Co.* v. *State,* 96 Tenn., 249, 34 S. W., 4. A corporation is indictable for committing a public nuisance, whether the committing of the act involves nonfeasance or misfeasance. 6 Heisk., 45; *Deaderick* v. *Bank,* 100 Tenn., 457, 45 S. W., 470; *Erwin* v. *Davenport,* 9 Heisk., 44; *Elmore* v. *Brooks,* 6 Heisk., 45; *Deaderick* v. *Bank,* 100 Tenn., 457, 45 S. W., 786; *Caulkins* v. *Gas Light Co.,* 85 Tenn., 683, 4 S. W., 287, 4 Am. St. Rep., 786.

So by the analogy suggested in the Vanderbilt University Case we hold that, although as a general rule the trust funds of a charitable corporation cannot be diverted by means of a judgment on account of the negligence of its employees and servants, nevertheless it may not enjoy immunity from damages where those damages result from the maintenance and operation of a nuisance. The maintenance of the nuisance in this case in effect takes away from the complainant his property. The defendant, by this means, is relieved of the expenditure of a large sum of money rather than take care of its sewage without injury to others. In the exercise of its functions it cannot compel others to contribute to its charitable fund by way of submitting to the destruction of his property in the operation of the charity.

There is still another reason why this trust fund doctrine should not be extended to cases of this character. The fundamental reason upon which the doctrine is bottomed is that of public policy which looks to the encouragement of charities established for the benefit of the whole public,

and that the rights of the individual in such instances must be subordinated to the public good. No immunity should be extended which tends to thwart the efficiency of this principle. No serious obstacle may be thrown in the way if the immunity be limited to the torts of the servant in connection with some operation incident to carrying out the trust, but if extended to the acts of the corporation itself mismanagement is encouraged, and the charity goes to pieces upon the rock of its immunity.

Vicarious or constructive liability is of comparatively recent origin. The rule of *respondeat superior* is the outgrowth of advanced social conditions, inspired and brought about by that principle of social duty which our public policy came to recognize, that every man in the management of his own affairs, whether by himself or by his agents or servants, shall so conduct them as not to injure another, and in the practical administration of this principle it was deemed important not to limit the liability to the acts of the principal, but to extend it to the acts of his servants. Always men have been responsible for their own misconduct, and it is only by reason of public policy that he has been held liable for the acts of his servant. The reason for this may well be sufficient to protect funds donated to charity against constructive liability, but do not obtain as against direct liability. The rights of those who may be injured at the hands of mere employees may well be subordinated to the general public who are benefited by the administration of a charitable trust, whereas even public good may suffer for the maladministration of a charitable trust occasioned by the person himself designated to administer it. It is easy to see if a charitable fund is subjected to all the errors of all the employees who may

be selected to perform incidental services in connection with its administration, it might soon consume the fund itself and destroy the trust.    Whereas, if the person executing the charity is held to strict accountability for the administration thereof, the administrators may be more careful for the protection of the funds in the execution of the benevolent purposes of the trust.   We know that any individual who, although actuated by benevolent motives, undertakes to do a charity and perform a public service, cannot escape liability for any injury which he negligently inflicts in the performance of that charitable duty.  Notwithstanding this principle by which the individual is bound, he may escape it altogether by the employment of a charitable organization, and render himself immune from liabilities otherwise attaching if the organization is immune.   There are undoubtedly acts performed by agents of a corporation which may be attributed to the corporation itself, and which do not depend on the ordinary rules of *respondeat superior*.   It is true that all corporations, being in a sense fictitious, must act through means of personal agents, but we have long since gotten away from the opinion which obtained early in the history of corporations that they are without soul, mind, hands, or body and therefore not chargeable with either wrongful acts of omission or of commission.   The souls and minds of natural persons shape their course, direct their operations, and control their activities, and therefore whatever is done by those who shape a corporation's course is the conduct of the corporation itself, and where the corporation itself conducts its affairs in such a way as to do injury to others, it ought to be held accountable, and no rule of immunity ought to be extended to it unless demanded by reasons of public policy.   Since public policy is against allowing one

person to appropriate the property of another, against the destruction of the property of one at the hands of another and against the dangers incident to the creation and maintenance of public nuisances, especially where the nuisance reflects upon the public health, the immunity afforded by the trust fund doctrine ought not to apply to a case like the one presented here. Isolated cases of negligence by employees do not fall within this category, and persons sustaining damages therefrom may, in the interest of society generally and the public good, be cast for his remedy against the individual employee who produced it. We are aware of decisions in which the reasoning may be said to be to the contrary, although we have found none and have been referred to none in which immunity has been extended under the trust fund doctrine to cases of damages resulting from the maintenance of a nuisance. The supreme court of Massachusetts in *Roosen* v. *Peter Bent Brigham Hospital*, 235 Mass., 66, 126 N. E., 392, 14 A. L. R., 563, held that there was no distinction between the liability of an employer for the negligence of his servants in the course of their employment and for his own negligence in selecting competent servants, and relieved a hospital administering a public charity from liability for personal injuries sustained as a result of the negligence of its employees negligently selected. Another case along this same line is that of *Vermillion* v. *Woman's College of Due West*, 104 S. C., 197, 88 S. E., 649. With some of the reasoning on which the conclusions of these courts are based we are unable to concur. We recognize the soundness of the general rule that the conduct on the part of the managers of the trust fund relates just as the work of the employees to the execution of the charity, and for all practical purposes when no public policy is

involved the consequences are of a similar nature, but to extend immunity to charitable corporations for consequences attributable to the misconduct of the corporation itself is quite a different thing to that of affording immunity for the consequences of an occasional act of negligence upon the part of employees, when considered in connection with the public accepted by the courts for the protection of charitable funds. Especially should this distinction be made in cases such as we have here, where the injury results from the creation and maintenance of a nuisance injurious in its nature to the public health, and operating to deprive a citizen of his property rights. We conclude, therefore, that in this case the defendant Nashville Agricultural & Normal Institute cannot be exempted from liability for the damages which resulted to the complainant by the maintenance of the nuisance determined under the facts of this case to have existed.

The contention by the other defendants who acted in behalf of the corporation itself in the creation and maintenance of this nuisance is not well taken, whether it be said their actions with respect thereto were those of malfeasance or nonfeasance; these gentlemen were the body, soul, and spirit of this corporation; theirs were the minds and hands that permitted this nuisance to exist; they were the direct agents and representatives of the corporation itself, and they cannot be permitted to escape the effect of their conduct, whether it be attributed to omission or commission, by reason of the fact that they did not purposely commit the wrong. The rule of nonliability for the negligence of an agent or servant on account of nonfeasance is limited to the breaches of duty owed by the agent or servant to his principal. It has no application where there is a

146 Tenn.—37

breach of duty owing by the agent himself to third persons. The duty of a corporation not to create and maintain this nuisance was one which the corporation could only perform through the acts of the managers and trustees of the institution.

These defendants cannot hide behind the doctrine of agency. They are the persons who committed the wrong, or who omitted to perform a duty owing to the complainant. They are principals so far as the complainant is concerned. Cases cited in 2 C. J., 827, 828; *Gamble* v. *Vanderbilt University*, 138 Tenn., 616, 200 S. W., 510, L. R. A., 1918C, 875.

Another assignment of error challenges the correctness of the measure of damages fixed by the chancellor as the basis for the order of reference to ascertain and fix the amount, to-wit: (1) To the reputation of the spring as a pure and medicinal water; (2) in the value of the property; (3) the proceeds of the spring. These are all proper elements to be considered in arriving at the damages. They are not speculative in their nature, and are not intended to make allowance for anything except to compensate the complainant for the actual loss sustained. Any claims other than those which enter into compensation will be disallowed on the reference. In case the proof shall show that the water was contaminated and rendered unusable or unsalable by other causes than its pollution by defendants during any of the time, no damages will be allowed for loss of sales or use during that time.

With the modification just indicated, the decree of the court of civil appeals will be affirmed, with costs.

Damages accruing since the institution of this suit can be taken care of out of the bond given for that purpose pending the appeal.